# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**CYNTHIA PAYTON**

**CIVIL ACTION**

**VERSUS**

**NO. 18-563-JWD-EWD**

**TOWN OF MARINGOUIN, ET AL.**

### RULING AND ORDER

This matter comes before the Court on three interrelated motions. The first is the *Motion for Summary Judgment Pursuant to FRCP 56* (Doc. 100) ("*Town MSJ*") filed by defendant the Town of Maringouin (the "Town" or "Maringouin"). Plaintiff Cynthia Payton ("Plaintiff" or "Payton") opposes the motion, (Doc. 106), and the Town has filed a reply, (Doc. 110). The second motion is the *Motion for Summary Judgment* (Doc. 102) ("*A&D MSJ*") filed by defendants Chief Hosea Anderson ("Anderson") and Terrance Davis ("Davis"). Plaintiff opposes the motion, (Doc. 107), and Anderson and Davis have filed a reply, (Doc. 109). The third motion is *RJ's Defendants' Motion for Summary Judgment* (Doc. 103) ("*RJ's MSJ*") filed by RJ's Transportation, LLC, ("RJ's") and Patrick Ventress ("Ventress"). Plaintiff opposes this motion, (Doc. 108), and RJ's and Ventress filed a reply, (Doc. 111). Oral argument is not necessary. The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule.

For the following reasons, each motion is granted in part and denied without prejudice in part. The motions are granted in that all federal claims against these defendants are dismissed with prejudice. The motions are denied without prejudice with respect to the state law claims.

Additionally, Plaintiff's facial challenge to the criminal defamation statutes, La. Rev. Stat. Ann. §§ 14:47, 48, & 49 shall be dismissed, as Plaintiff (1) failed to assert this claim against the

proper party defendant (here, the district attorney or governor) and (2) waived the claim by failing to include it in the pretrial order.

Plaintiff shall be given fourteen (14) days in which to file a supplemental brief (not to exceed ten (10) pages) to address why any federal claims against the non-moving and remaining *pro se* defendants, Edward James ("James") and Dwayne Bourgeois ("Bourgeois"), should not be dismissed for the same reasons as provided for the similarly situated RJ's and Ventress. All other parties will be given seven (7) days thereafter to respond. If Plaintiff fails to make a sufficient showing, the Court will very likely decline to exercise supplemental jurisdiction over all remaining state law claims.

Finally, Plaintiff's *Motion for Partial Summary Judgment* (Doc. 87) as to the state law malicious prosecution claims against Bourgeois and James is denied without prejudice pending a determination of these jurisdictional issues.

## I.     Relevant Factual Background

### A.  Introduction

Plaintiff is a resident of the Town of Maringouin. (*See* Maringouin's *Statement of Uncontested Material Facts to which the Town . . . Contends There Is No Genuine Issue* ("*T-SUMF*") ¶ 5, Doc. 100-2; Pl.'s *Statement of Disputed Material Facts and Request to Strike Statements of Material Fact* ("*PT-SDMF*") ¶ 5, Doc. 106-1.)[1]

Anderson is the Chief of Police for the Town. (*T-SUMF* ¶ 2, Doc. 100-2.) Davis is a police officer for Maringouin. (*Id.* ¶ 3.)

Eugene Simpson is the Justice of the Peace for Iberville Parish. (*Id.* ¶ 4.) He normally comes to the Maringouin substation to "do a warrant; or meet with a Complainant, or whatever."

---

[1] Virtually all of the facts in Town's *T-SUMF* are admitted by Plaintiff. (*Compare T-SUMF* ¶¶ 1–15, Doc. 100-2, *with PT-SDMF* ¶¶ 1–15, Doc. 106-1.) When the *T-SUMF* is cited, then Plaintiff has admitted that fact in the *PT-SDMF*.

(Anderson Dep. 100, Doc. 100-3.) Simpson was previously named as a defendant in this action, but he was dismissed following a successful Rule 12(b)(6) motion. (Doc. 60.)

Ventress, James, and Bourgeois are private citizens who drive commercial trucks for a living. (Anderson and Davis's *Statement of Uncontested Facts in Support of Motion for Summary Judgment* ("*A&D SUF*") ¶ 2, Doc. 102-1; Pl.'s *Statement of Disputed Material Facts* ("*PA&D-SDMF*") ¶ 2, Doc. 107-1.)[2] Ventress is employed by RJ's. (*A&D SUF* ¶ 6, Doc. 102-1.)

Plaintiff alleged that Bourgeois and James were RJ's employees. (*Am. Compl.* ¶11, Doc. 16.) On October 19, 2020, counsel for RJ's moved to withdraw from representing Bourgeois and James because they were not RJ's employees. (Doc. 79 at 2.) Though Plaintiff opposed the motion, (*id.* at 3), the Magistrate Judge orally granted this motion, (Doc. 84.) Thus, Bourgeois and James are presently *pro se.* They do not join in the *RJ's MSJ*. (*See* Doc. 103.)

---

[2] In *PA&D-SDMF*, Plaintiff admits (fully or partly) many of the facts contained in the *A&D SUF*. (*See A&D SUF* ¶¶ 1–2, 6,–7, 9, 11–13, 15–20, Doc. 102-1; *PA&D-SDMF* ¶¶ 1–2, 6,–7, 9, 11–13, 15–20, Doc 107-1.) Where the *A&D SUF* has been cited, Plaintiff has deemed that statement admitted.

Additionally, it must be noted that Plaintiff failed to comply with Middle District of Louisiana Local Civil Rule 56(c). This rule state in relevant part, "The opposing statement shall admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts and *unless a fact is admitted, shall support each denial or qualification by a record citation as required by this rule*." M.D. La. LR 56(c) (emphasis added). Local Civil Rule 56 further provides, "The court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment. The court shall have no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts." M.D. La. LR 56(f). The Town also failed to provide record citations, but any failure was mitigated by Plaintiff's admitting to virtually all of these facts. (*See T-SUMF* ¶¶ 1–15, Doc. 100-2; *PT-SDMF* ¶¶ 1–15, Doc. 106-1.) Thus, the Court may consider other facts admitted for purposes of these motions. "However, case law recognizes that the Court can still consider record evidence to determine if there is a factual dispute." *Braud v. Wal-Mart Stores, Inc.*, No. 17-320, 2019 WL 3364320, at *4 (M.D. La. July 25, 2019) (deGravelles, J.) (citing *Smith v. Brenoettsy*, 158 F.3d 908, 910 (5th Cir. 1998) (holding, where plaintiff failed to oppose the motion for summary judgment, that facts in "Statement of Undisputed Facts" were admitted, "except to the extent that the 'facts' in the 'Statement of Undisputed Facts' are contradicted by 'facts' in other materials attached to his motion for summary judgment." (citation omitted)); *Porter v. Dauthier*, No. 14-41, 2015 WL 5611647, at *8, *13 (M.D. La. Sept. 23, 2015) (deGravelles, J.) (relying on *Smith* and holding, when Plaintiff's opposition left "no doubt about his disagreement with either the basis or import of each of Plaintiff's undisputed facts," that Plaintiff would have forty-eight hours from the issuance of the ruling to comply with the Local Rule, and ultimately denying the motion for summary judgment)).

### B. Truckers' Parking and Bourgeois' History and Harassment

In August 2015, individuals parked trucks and trailers close to Cynthia Payton's home and nearby railroad tracks on the Town's property. (*T-SUMF* ¶ 5, Doc. 100-2.)  Mayor Demi Vorise gave authorization for the trucks to be parked there. (*Id.* ¶ 6.)  Cynthia Payton knew the individuals had authorization to park their vehicles near the railroad tracks. (*Id.* ¶ 7.)

Anderson testified how Plaintiff complained to him in April 2016 about Bourgeois harassing her and threatening to shoot her. (Anderson Dep. 45–46, 57, Doc. 102-3.)  Anderson said this was not an empty threat, (*id.* at 60);  Anderson knew Bourgeois had "shot somebody" and "had been arrested for some things," including "one just being domestic . . . with him and a female," though Anderson did not remember what the domestic thing was, (*id.* at 44–46).  Bourgeois had shot the man in the face and had been arrested for attempted second degree murder. (*Id.* at 13–14.)  In any event, Anderson did not arrest Bourgeois for his threatening Plaintiff, and Anderson did not remember if he talked to Bourgeois about it. (*Id.* at 59–60.)

On August 25, 2017, Anderson sent Officer Dorsey to Payton's home to inform her that individuals were making complaints about her. (*T-SUMF* ¶ 8, Doc. 100-2.)  Later, Deputy Ricky Saurage met with Payton and made a report of her complaint of Anderson. (*Id.* ¶ 9.)  More specifically, on August 30, 2017, Payton complained to the police again about being stalked, "threaten[ed] and scared for her life." (Anderson Dep. 62–65, Doc. 102-3; Ex. 4 to Anderson Dep., Doc. 102-3 at 238.)  When Plaintiff would write down license plate numbers, Anderson would tell her that people wanted to physically beat her, and he would then tell those people not to do it and that they would go to jail. (*Id.* at 77–78.)  When Plaintiff would make a complaint, Anderson would also send deputies to her to let her know what the community was saying, and Plaintiff perceived this as harassment. (*Id.* at 94–95.)

### C. Plaintiff's Letter(s) to RJ's: Circumstances, Contents, and Truth

On September 27, 2017, Payton wrote a letter to RJ's concerning the conduct of RJ's employees and their operation of its trucks, and Anderson. (*T-SUMF* ¶ 10, Doc. 100-2.) The letter provided:

> September 27, 2017
>
> RJ Trucking
> [address omitted]
> Port Allen, LA 70767
>
> To Whom It May Concern:
>
> This letter is written to make you aware of the situation that involves your trucks in Maringouin.
>
> More than 2 years ago, August 2015, one of your drivers was parking a hazardous material truck on Church Street. This truck was in violation of the State and Federal regulations regarding the distance from a residence.            This is how it began.
>
> From that point, Patrick Wayne Ventress inserted himself, followed by a another [sic] male called "Little Buck."[3] This Little Buck, the god to all of the lost men, women, boys, and girls.
> This speaks to the culture and the little value this type has for women. Just as Ventress joined in, another male, Edward James also fully committed himself. And in doing so, his special friend, the Chief of Police, Hosea Anderson flew in to make sure their rights were fully protected and everyone else is trampled upon.
> This snowballed into the mob situation that it is today.
> These three individuals' families and friends formed what is now known as the Maringouin Mob, which consist of the 1500 Gang, along with thugs, lowlife, and other blithering idiots of the adjoining communities.
>
> As I can appreciate it, many of these individuals are on public assistance and are receiving some monetary reward to harass and intimidate me.
>
> These individuals come to my job daily and are regularly disruptive. They follow me to and from work and all points in between.

---

[3] "Little Buck" is an alias used by Dwayne Bourgeois. (Anderson Dep. 43–44, 59, Doc. 102-3.)

> It is my intention to share with their employers the daily activity of these mobsters since my employer has to deal with this inconvenience on a daily basis.
>
> So each week I will make sure that you all are updated on this matter.
>
> Until next week.
>
> Sincerely,
>
> Cynthia Payton

(Payton Dep. 56, Doc. 102-4; Ex. 3 to Payton Dep., Doc. 102-5 at 73.)

A second letter, dated October 4, 2017, is addressed to "Trucking Terrorist." (Payton Dep. 56–57, Doc. 102-4; Ex. 4 to Payton Dep., Doc. 102-5 at 74.) The contents of the letter are identical. The letter is unsigned, but "Cynthia Payton" is typed at the bottom of the letter with an address handwritten beneath Plaintiff's name. (Ex. 4 to Payton Dep., Doc. 102-5 at 74.) Plaintiff testified that she recognized the exhibit and that the word "Terrorist" and the P.O. box at the bottom are in her handwriting, but she said she was "not sure" about the circumstances of the change of date or whether she sent the October 4, 2017, letter.[4] (Payton Dep. 57, Doc. 102-4.)

In any event, one or both of these letters found their way to RJ's. (*A&D SUF* ¶ 6, Doc. 102-1.) Ventress testified that he first learned that Payton was complaining about where he was parking around October of 2017, around the time he was being harassed by Payton. (Ventress Dep. 56, Doc. 102-6.)

As will be explored below, a key issue in the case is whether the letter contained false statements. On that issue, Ventress testified that the following was untrue:

---

[4] Plaintiff asserts in her *PA&D-SDMF* that "There is no evidence that Payton sent this second letter[,] and the cited testimony does not indicate that she did." (*PA&D-SDMF* ¶ 5, Doc. 107-1.) But this statement is wrong as a matter of fact and law. The fact that Plaintiff recognized the exhibit and had her handwriting on it is certainly some competent evidence that she sent the letter; at the very least, the inference can be made that she did.

Q.       About parking across from her house; that we hauled—transported illegal, like, chemicals, or whatever; she had say we hauling chemicals; and I never put a loaded trailer with chemicals; that trailer was empty; it might have had empty trailers; no loaded trailers; empty.

            I used to park there years, and years, before that happened; all of a sudden—in Plaquemine, I never had that trouble; all of a sudden, at this period of time, Ms. Payton started, recently, doing this about with the trucks.

            But that's what the letter was for; from her, that I was illegal parking placard trailers in front of her house.

Q.       You say placard truck. It's got a placard showing the chemical?

A.       Yeah . . . But it was a empty trailer; nothing was in it.

(*Id.* at 84–86.) Ventress acknowledged, however, that his truck and trailer had "RJ's" on it. (*Id.* at 70–71.)

Plaintiff, on the other hand, testified who she thought the 1500 Gang was ("a gang of boys who were guarding the trucks"), but she was not sure if she had any evidence the truck drivers (i.e., Ventress, James, and Bourgeois) were in the alleged gang. (Payton Dep. 125–26, Doc. 102-5.) She did admit that, in the letter, she "call[ed] the truck drivers mobsters and members of the Maringouin Mob[.]" (*Id.* at 124–125.) Plaintiff also testified that the "thugs, lowlifes and blithering idiots" she was referring to were "[s]talkers who are participating, like the individual who will pass by and present their middle finger, calling me a bitch, whore, et cetera." (*Id.* at 126.) But when asked if she had any evidence the truck drivers were in cahoots with these individuals, she said:

I'm only basing that upon their behavior. These are people I don't know, and I'm just basing it upon their behavior . . . That would have to be a case-by-case basis, and so I am not sure of all the individuals who I've referenced. But, like I said, Maringouin is very related individuals.

(*Id.* at 126–27.)  Plaintiff also said she described these individuals as "thugs, lowlifes and blithering idiots" "[b]ecause of their aggressive behavior like [Maurice] Mitchell." (*Id*. at 127.)   Plaintiff had no knowledge that the truck drivers are on public or government assistance (though she denied saying they received it), and she was "unsure" that that the truck drivers were receiving a monetary reward to harass and/or intimidate her. (*Id*. at 127–28.)

### D.  Defendants' Voluntary Statements and Affidavits

On October 17, 2017, Payton made a complaint to District Attorney Ricky Ward regarding all of her complaints and concerns relating to the Maringouin Police Department, Anderson, the Iberville Parish Sheriff, and Justice of the Peace Simpson. (*T-SUMF* ¶ 11, Doc. 100-2.)

On the same day, Ventress, James, and Bourgeois spoke personally with Anderson and told him the letter sent by Plaintiff to RJ's contained statements that were untrue. (*A&D-SUF* ¶ 7, Doc. 102-1.)  Each of these individuals prepared Voluntary Statements. (Anderson Dep. 189, 192, Doc. 102-3; Ventress Dep. 89, Doc. 102-6.)   Ventress's statement said in relevant part that Plaintiff "mail [sic] a letter to my job with false statement about me.  She acuse [sic] me of being over [sic] gang, harassing her on her job, and follow [sic] her from her job." (*A&D SUF* ¶ 11, Doc. 102-1.)[5] Bourgeois' statement said in relevant part that his "job received a certified letter from her stating I was the leader of trucking terrorist.  About to lose my job for nothing." (*Id.* ¶ 12.)[6]

---

[5] The entire statement read:

> Cynthia Payton called my job harassing my boss about Truck park on Church St. several times.  She also harass me by truck park across the street from her house.  She also mail a letter to my job with false statement about me.  She acuse me of being over gang, harassing her on her job, and follow her from her job.  I am tired of her harassing me for no re[a]son.

[sic throughout] (Ex. 2 to Ventress Dep., Doc. 102-6 at 114.)

[6] The entire statement read:

> I Dwayne Bourgeois got a phone call on 8-27-16 from my job Boss Tony Gauther saying someone was going on by the tuck.  The truck was parked by the old Town Hall when I went to see what was going on Synthia Payton was standing in her

The Voluntary Statement form contained typed language above the handwritten part saying that the person making the declaration did so "of [his] own free will, *knowing that such statement could later be used against [him] in any court of law*, and [he] declare[s] that this statement [was] made without any threat, coercion, offer of benefit, favor or offer of favor, leniency or offer of leniency by any person or persons whomsoever." (Exs. 9, 11 to Anderson Dep., Doc. 102-3 at 249, 251; Ex. 2 to Ventress Dep., Doc. 102-6 at 114 (emphasis added).)  Further, above the signature line at the bottom, the truckers certified that "the facts contained [in the statement] are true and correct." (Exs. 9, 11 to Anderson Dep., Doc. 102-3 at 249, 251; Ex. 2 to Ventress Dep., Doc. 102-6 at 114.)

Ventress, James, and Bourgeois also signed affidavits before the Justice of the Peace, all of which are substantially identical and state that, "Cynthia Payton on October 16, 2017 . . . did commit the crime of defamation by sending a letter to [their] boss with false statements." (Exs. 10, 12 to Anderson Dep., Doc. 102-3 at 250, 252; Ex. 1 to Ventress Dep., Doc. 102-6 at 113.)  The affidavits were sworn before the Justice of the Peace. (Exs. 10, 12 to Anderson Dep., Doc. 102-3 at 250, 252; Ex. 2 to Ventress Dep., Doc. 102-6 at 114.)  A warrant of arrest was issued on the same page stating that a complaint had been made before him "upon oath of" Ventress, James, and Bourgeois charging Plaintiff with "RS 14:47 Defamation." (Exs. 10, 12 to Anderson Dep., Doc. 102-3 at 250, 252; Ex. 1 to Ventress Dep., Doc. 102-6 at 113.)

---

yard. She had call on said I was not supposed to be park there, I started parking on th oter side of the tracks. She comes over there right down the plate number still. When I pass she call the police on me for no reason.  Weeks ago she tried to run over m in her truck.  Daniell was call out to the seen.  On yesterday 10-16-17 my job received a certified letter from her staying I was the leader of trucking terrorist.  About to lose my job for nothing.

[sic throughout] (Ex. 11 to Anderson Dep., Doc. 102-3 at 251.)

Plaintiff disputes whether Ventress complained because of the letter or for other reasons. Plaintiff highlights the following testimony from Ventress:

> Q. All right. How did you happen to go to the substation that day?
>
> A. On my own.
>
>   . . .
>
> Q. Okay. And this was all about a letter that was written to RJ's?
>
> A. Nope.
>
> Q. What was it about?
>
> A. I'm tired of being videoed, and harassed; I want to get something done about it; that's why I went to file the charges.
>
> Q. It wasn't because RJ's got a letter on October 16th?
>
> A. No; not about RJ's; nothing; I'm tired of being harassed at my job because of that; I'm . . . she's trying to get me to lose my job, or something. I mean, why you do something to my job? I ain't done nothing wrong to you.
>
> Q. Your job. You're talking about RJ's?
>
> A. Yeah.

(Ventress Dep. 66–67, Doc. 102-6.) Later, however, Ventress testified that he filed charges on October 17th saying that Plaintiff defamed him because "[s]he sent a letter to [his] . . . job . . . [RJ's] . . . , with false statements and stuff." (*Id.* at 81.)

Additionally, on the same day, Anderson learned that Plaintiff's letter alleged his involvement with Ventress, James, and Bourgeois. (*See T-SUMF* ¶ 12, Doc. 100-2.) Anderson called Justice of the Peace Eugene Simpson and told him:

> A. I was filing a report, or had filed a report; and, uh, could charges be filed because of my statement of what I believe

was going on. . . . I told him that, uh, I had been lied on; she had posted things; about signs; and I feel like she was defaming who I was, and what I was.

Q.      Okay.  What was defamatory about what Ms. Payton said?

A.      Well, just not being true; I was protecting citizens of Maringouin; and I wouldn't do nothing about the complaints; and everything else.

Q.      In other words, you weren't doing your job?

A.      That's the way she could have put it; but that's not the way I took it; no.

Q.      Well, I mean, protecting citizens of Maringouin doesn't sound like a bad thing.

A.      That's my job.

Q.      Right.

A.      Yeah.

Q.      So if she's saying you're protecting citizens of Maringouin—

A.      Well, not protecting her.

Q.      You put that on a campaign ad; right? That's not defamation.

A.      Well, not protecting her; but when she's a citizen of Maringouin, as well.

Q.      Okay.  And that was, pretty much, true; isn't it?

A.      No; it's not.

        . . .

Q.      And what else did you tell Simpson that she was doing; that Ms. Payton was doing?

A.      That was—that was, probably, it, in a nutshell; I didn't, really, go into details; I just surmised what happened.

(Anderson Dep. 114–15, Doc. 100-3.)

Plaintiff highlights that Anderson testified in his deposition that "I don't think the letter was about me." (Anderson Dep. 12, Doc. 100-3.)  But this is contradicted by the contemporaneous records and the fact that Plaintiff concedes in her *PT-SDMF* ¶ 12, Doc. 106-1, that "Chief Anderson learned a letter was sent to RJ's Transportation by Payton alleging his involvement with [Ventress, James, and Bourgeois]." (*T-SUMF* ¶ 12, Doc. 100-2.)

Plaintiff also emphasizes that Anderson did not know what was in the letter, that he did not have a copy of the letter at the time of the deposition, and that the letter was not listed as evidence for the initial report made to Jones. (Anderson Dep. 143–144, Doc. 102-3; Ex. 7 to Anderson Dep., Doc. 102-3 at 243–46.)  Anderson specifically said:

> Q.	Did you have the letter when you spoke to Simpson?
>
> A.	I didn't have it; no.
>
> . . .
>
> Q.	So you were only complaining about Ms. Payton?
>
> A.	Myself.
>
> Q.	Yeah.  And your Complaint was not about a letter when you spoke to Simpson.
>
> A.	No.
>
> Q.	"She also mailed a letter to his job with false statements about him".
> Do you know whether that's true?
>
> A.	From—from what he told me, again.
>
> . . .
>
> Q.	Ventress?
>
> A.	Yes.

> Q. Okay. Do you know what the false statements were?
>
> A. I'm guessing whatever was on the letter.
>
> Q. Okay. But you don't know what was on the letter?
>
> A. Right.
>
> . . .
>
> Q. Okay. You don't know whether any of the statements about Ventress were false; right in the letter. . . . Do you know, one way or the other, whether they're true, or false?
>
> A. I don't know.

(Anderson Dep. 142–44, Doc. 100-3.) Anderson said Plaintiff had defamed him with "a video that she had posted" saying that Anderson "was letting [citizens] do whatever they wanted to do;" a "sign on a door saying that [he] was protecting citizens and stuff like that; which was not true;" and the letter. (*Id.* at 11, 172.) Anderson felt like Plaintiff was defaming and harassing him. (*Id.* at 41, 148–49.)

In any event, Anderson also filed a Voluntary Statement and signed an affidavit stating that Payton had defamed him. (*T-SUMF* ¶ 13, Doc. 100-2.) Anderson's Voluntary Statement said:

> On 10-16-17 I H. Anderson, Sr. spoke with several subjects who advised me that Ms. Cynthea [sic] Payton sent letters to their employers' stating things that were untrue. They went on to state that Payton has called or harassed them on several occasions. After [receiving] the letter, I noticed my name was referenced as a negative impact to the situation. This is not the first time Payton has done this type of thing against me or the subjects who advised me about the letter. She have [sic] been notified on several occasions that what she was doing was not correct, but continued to harass people in the community.

(Ex. 9 to Anderson Dep., Doc. 102-3 at 249.)  The form contains a typed statement which says, "I have read this statement consisting of ___ page(s) and the facts contained are true and correct." (*Id.*)

Anderson's affidavit stated that Payton "did commit the crime of defamation by sending a malicious publication's [sic] to business's [sic] with false statements about Hosea Anderson." (Ex. 8 to Anderson Dep., Doc. 102-3 at 248.)  The warrant of arrest was issued by the Justice of the Peace based on the complaint made by Anderson "upon oath." (*Id.*)

Plaintiff does not dispute that Justice of the Peace Simpson issued four arrest warrants for [her] based on the affidavits of Anderson, James, Bourgeois, and Ventress, (*see T-SUMF* ¶ 14, Doc. 100-2; *PT-SDMF* ¶ 14, Doc. 106-1).  One warrant related to the complaint by Anderson and the other three related to complaints by the three truck drivers. (*A&D SUF* ¶ 13, Doc. 102-1.)

But Plaintiff does dispute (1) that the  Justice of the Peace determined whether and what crime the facts presented by the complaining witnesses supported and (2) that the warrants were based upon the statements of the complaining witnesses that Plaintiff's letter contained false statements that were impacting their work. (*Compare A&D SUF* ¶¶ 10, 14, Doc. 102-1, *with PA&D-SDMF* ¶¶ 10, 14 Doc. 107-1.)  To support these points, Anderson and Davis point to the depositions of Anderson and Ventress. (*A&D SUF* ¶ 10 n.9, Doc. 102-1 at 2.) In the former's, Anderson testified that, everyone at the substation talked about the situation and that they discussed "pretty much, the letter; . . . what was in the letter; yeah; and stuff like that[.]" (Anderson Dep. 185, Doc. 102-3.)  Plaintiff's counsel also asked, "And everybody there—meaning you; Dwayne Bourgeois; Edward James; and Patrick Ventress—knew that Simpson was gonna' sign the arrest warrant?", and Anderson responded, "Again, I don't know if they knew that, or not; they was there; giving they [sic] statement as to what happened; now, whether Mr. Eugene would accept the

14

charges, or not, we don't [sic] know." (*Id.* at 186; *see also id.* at 148–49 ("[W]e met with Mr. Simpson; stated what we felt like; we felt like we was being defamed; if it was not the indication, Mr. Simpson wouldn't have accepted the charges. . . . He could have told us: 'Look, defamation', as you say it is, you know, 'is not good anymore'; and that would have been it.") Even more importantly, Ventress testified that Simpson prepared the affidavit based on what Ventress filled out in the Voluntary Statement; Simpson wrote the statute number "L.R.S. 14:7," and Ventress had no legal knowledge and did not know what that statute was. (Ventress Dep. 107–110, Doc. 102-6.)

Ultimately, Anderson told Plaintiff's counsel that he did not know that the statute had been held unconstitutional. (Anderson Dep. 106, Doc. 102-3.) Anderson testified that, if he had known the statute was unconstitutional, he would not have sworn out the complaint. (*Id.* at 149–50.) But Anderson also knew that, when the warrant was issued, Plaintiff would be arrested and handcuffed. (*Id.* at 153–54.)

### E. Plaintiff's Arrest by Davis

After issuance of the warrants, on October 17, 2017, Officer Terrance Davis executed a "fugitive" warrant, "placed [Plaintiff] under arrest, handcuffed (DBL) [her], verbally Mirandized [her], and transported [her] to West Baton Rouge Parish Jail for booking." (Anderson Dep. 195–198, Doc. 102-3; Ex. 14 to Anderson Dep., Doc. 102-3 at 254–58.) Davis arrested Plaintiff for what he described as being a "Fugitive from Iberville." (*A&D SUF* ¶ 15, Doc. 102-1; *T-SUMF* ¶ 15, Doc. 100-2.) As Anderson explained, at the time, Davis was "working for Maringouin; but he arrested for Iberville; even though it was the same parish, different entities; and the '14:000,' that's our code that we use for a fugitive from another agency." (*A&D SUF* ¶ 16, Doc. 102-1.)

The parties highlight different facts related to Plaintiff's arrest. Anderson and Davis point to the facts that Plaintiff had no scars, bruises, or cuts as a result of being handcuffed. (*Id.* ¶ 17.) She was originally handcuffed behind her back, but, when she requested him to do so, Davis re-handcuffed her in front. (*Id.* ¶ 18.) Plaintiff first saw Mr. Maddocks at Hidalgo Health Associates in May of 2020 for alleged stress and anxiety and was last seen by Mr. Maddocks on June 18, 2020. (*Id.* ¶ 19.) Prior to May of 2020, Plaintiff had seen a doctor only once for any condition she believed was related to her October 17, 2017, arrest. (*Id.* ¶ 20.)

Plaintiff submitted her own account of her arrest in the form of a declaration. (*Payton Decl.*, Doc. 106-2.) She testified that Davis and Jones arrested her on the night of October 17, 2017, at her home. (*Id.* ¶ 3.) When they did so, Davis grabbed her hands behind her back and clamped the handcuffs down "very tightly" on her arthritic wrists. (*Id.* ¶ 4.) Plaintiff said she immediately felt pain in her wrists and hands which lasted as long as the handcuffs were on, "biting onto [her] wrists." (*Id.*) Plaintiff further stated that, "After handcuffing me, Davis and Jones paraded me before a group of townspeople who had gathered across the street to watch and to record the scene with their cell phone cameras." (*Id.* ¶ 5.) Payton had never been handcuffed before, and she was "completely humiliated before the townspeople." (*Id.* ¶ 6.)

Plaintiff was brought to Maringouin Police Station where she was "uncuffed and recuffed to a metal chair while the deputies rummaged through [her] purse that Davis insisted [she] bring with [her] even though [she] wanted to leave it in [her] car." (*Id.* ¶ 7.) Plaintiff said this experience "compounded this violation of [her] senses[.]" (*Id.*)

"Davis then recuffed [her] tightly with [her] hands once again behind [her] back as [she] was forced to take a 30 mile ride with the cuffs pinching [her] wrists as [her] hands were once again sandwiched between [her] body and the seat." (*Id.* ¶ 8.) When she arrived in the lock up,

she remained in a holding cell with individuals she later learned "had drug or more serious charges." (*Id.* ¶ 9.)

Plaintiff said, "After I sat in this cell for more than an hour I calmed down slightly and began to notice that the other detainees were not cuffed as severely as I was." (*Id.* ¶ 10.) Further, "[e]very other person came in with their hands cuffed in the front and not in the back like mine." (*Id.* ¶ 11.) Plaintiff then asked Davis if he could cuff her hands in the front because they were hurting. (*Id.* ¶ 12.) "By this time [she] had spent over two hours with Davis's handcuffs cutting into [her] arthritic wrists." (*Id.* ¶ 13.)

Plaintiff also describes her three court dates in Plaquemine which she had to deal with as a result of her arrest. (*Id.* ¶¶ 14–18.) The charges were ultimately dismissed. (*Id.* ¶ 18.) At her last trip to court, she asked the prosecutors who brought the charges because she had not been told. (*Id.* ¶ 19.) "The prosecutor refused to say but harshly told me that I should stay off social media. She also indicated that I should not say anything else about Hosea Anderson." (*Id.* ¶ 20.) This statement, however, is hearsay. In any event, the district attorney ultimately dismissed all charges against Plaintiff. (*T-SUMF* ¶ 16, Doc. 100-2.)

Plaintiff said that she has "had a tsunami of emotions beginning with the night of the arrest and [has] had to seek professional counseling to help deal with this nightmare." (*Payton Decl.* ¶ 21, Doc. 106-2.) "As a result of being arrested and prosecuted I am filled with a wave of negative emotions and anxiety. I constantly relive the night of my arrest and the pain and humiliation it caused." (*Id.* ¶22.) Further, Plaintiff "no longer enjoy[s] life as [she] once did, no longer [can] watch certain television shows involving police, and live[s] in anxiety and fear of the police." (*Id.* ¶ 23.)

## II.     Rule 56 Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . .   [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986) (internal citations omitted). The non-mover's burden is not satisfied by "conclusory allegations, by unsubstantiated assertions, or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations and internal quotations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (internal citations omitted). Further:

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion.

*International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991) (internal citations omitted).

## III.     Discussion: Section 1983 Claims Against the Town and Anderson

### A.  Introduction

The Town and Anderson have filed separate motions; the former seeks dismissal of any municipal claims while the latter relies primarily on qualified immunity.  While these claims are usually distinct, here, the analysis is intertwined.

As will be discussed more extensively below, for municipal liability, " '[a] single decision by a policy maker may, under certain circumstances, constitute a policy for which a [municipality] may be liable.' " *Valle v. City of Houston*, 613 F.3d 536, 542 (5th Cir. 2010) (quoting *Brown v. Bryan County,* 219 F.3d 450, 462 (5th Cir. 2000) (alterations in original)). "However, this 'single incident exception' is extremely narrow and gives rise to municipal liability only if the municipal actor is a final policymaker." *Id.* (citing *Bolton v. City of Dallas,* 541 F.3d 545, 548 (5th Cir. 2008)). Here, Plaintiff attempts to use this single incident exception to impose liability on the Town. Plaintiff points to three underlying constitutional violations attributable to Anderson: (1) a First Amendment retaliation claim; (2) a Fourth Amendment false arrest claim; and (3) a Fourth Amendment malicious prosecution claim.

Additionally, "[i]n determining whether an official enjoys immunity, we ask (1) whether the plaintiff has demonstrated a violation of a clearly established federal constitutional or statutory right and (2) whether the official's actions violated that right to the extent that an objectively reasonable person would have known." *Gobert v. Caldwell*, 463 F.3d 339, 345 (5th Cir. 2006) (citing *Hope v. Pelzer*, 536 U.S. 730 (2002)). Thus, to impose liability on Anderson, Plaintiff must also establish a constitutional violation.

Consequently, because Plaintiff must demonstrate constitutional violations by Anderson for her claims against him and the Town, the Court will discuss these issues in a single section.

## B. Parties' Arguments: *Town MSJ*

### 1. The Town's Original Memorandum (Doc. 100-1)

The Town argues that Anderson filed an affidavit because he believed Plaintiff defamed him and that the mere filing of an affidavit does not impose liability. (Doc. 100-1 at 5–6.) Rather,

the Justice of the Peace's conduct was the causal connection to the alleged constitutional violation rather than Anderson's. (*Id.*)

According to Maringouin, Plaintiff maintains that it is liable by the Chief's actions because the anti-defamation statute, La. Rev. Stat. Ann. § 14:47, was "unconstitutional insofar as it attempts to punish public expression and publication concerning public officials, public figures, and private individuals who are engaged in public affairs" (*Id.* at 6 (quoting *Am. Compl.* ¶ 7, Doc. 16 (citing *State v. Snyder*, 277 So. 2d 660, 668 (La. 1972), *rev'd on other grounds*, 304 So. 2d 334 (La. 1974))).) But, the Town asserts that the Louisiana Supreme Court's ruling "does not exclude public figures from defending themselves from defamation and merely places a higher burden on these public individuals." (*Id.*) Rather, the Town must show that the statements were made with "actual malice." (*Id.* (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964)).) The Town continues:

> Simply put, a public official in Louisiana can file a claim, report, or an affidavit alleging defamation, only the bar to succeed is higher. Although the law must be applied differently to Chief Anderson based on his status as Chief of the Town of Maringouin, the action of filing an affidavit did not violate a constitutional right or create a policy for the Town of Maringouin. The plaintiff wrote a letter to RJ's Transportation, including information regarding Chief Anderson. When Chief Anderson was made aware of the letter and its contents, he reasonably believed that the plaintiff had defamed him. Chief Anderson then went through the proper and necessary channels to file a complaint and report, then signed an affidavit upon this belief. The Justice of the Peace then issued an arrest warrant. There were no actions by the chief that created a policy, which would result in liability of the Town of Maringouin.

(*Id.* at 6–7.)

The Town also disputes Plaintiff's failure to train or supervise claim. (*Id.* at 7.) Maringouin argues there is no "custom" or "policy" or "any allegations as to the type of training and/or supervision that should have been conducted to avoid the alleged violation of Plaintiff's

constitutional rights[.]" (*Id.*) Plaintiff's failure to train and supervise claim comes solely from the following allegation in the *Amended Complaint*: "Town of Maringouin and Anderson failed [to] train and supervise Davis in the lawful application of Louisiana's criminal defamation law and the law application of Louisiana Law respecting fugitives from justice, and the arrest and prosecution of Payton was a plain and obvious consequence of the failure." (*Id.* (quoting *Amended Complaint* ¶ 115, Doc. 16).) But Plaintiff ignores the fact that three other private persons also filed affidavits for defamation against her, all of which were signed by the Justice of the Peace. Plaintiff's broad and general statements about the failure to train and supervise are insufficient.

The Town next moves to the malicious prosecution claims. Maringouin argues that there is no such viable claim under § 1983, so it must be dismissed. (*Id.* at 9–10.)

### 2. *Plaintiff's Opposition to the Town MSJ (Doc. 106)*

Plaintiff responds that *Snyder* "did not save any aspect of the law as it relates to public officials such as Anderson[.]" (Doc. 106 at 8.) According to Payton, "the *Snyder* court held 'R.S. 14:47, 48, and 49 to be unconstitutional insofar as they attempt to punish public expression and publication concerning public officials, public figures, and private individuals who are engaged in public affairs.' " (*Id.* (quoting *Snyder*, 277 So. 2d at 668).) Thus, for Plaintiff, "the defamation law may not be used to punish *any* public expression about public officials, whether true or false and whether made maliciously or in good faith." (*Id.*) Plaintiff relies on *Anderson v. Larpenter*, No. 16-13733, 2017 WL 3064805 (E.D. La. July 19, 2017), for this position. Consequently, Defendant is wrong when it urges that a public official can file an affidavit alleging defamation, "only the bar to succeed is higher," as this is not about the tort of defamation, it is about the crime of defamation. (Doc. 106 at 8–9.)

Plaintiff next urges that Anderson was a chief policymaker of the Town. According to Plaintiff, Maringouin concedes that the municipality can be liable if the policymaker directly causes the injury, and here, Anderson did that through his failure to train Davis in the unconstitutionality of the defamation law and Anderson's own conduct. (*Id.* at 10 (citing Doc. 100-1 at 5).) First, Anderson retaliated against her in violation of the First Amendment, as he was "motivated to have Payton arrested because she was criticizing and 'speaking mean about' him." (*Id.* at 10 (quoting Doc. 100-3 at 41).)

Second, there is a Fourth Amendment claim that is not defeated by the independent intermediary doctrine. (*Id.* at 11–12.) The key question is whether a reasonably trained officer would have known that his affidavit failed to establish probable cause and that he should not have applied for a warrant, and, here, "Anderson presented no evidence to Simpson to support the probable cause for the arrest of Payton." (*Id.* at 11 (citing in part *Jennings v. Joshua Indep. Sch. Dist.*, 877 F.2d 313, 317 (5th Cir. 1989)).)

And third, there is a Fourth Amendment claim connected to a malicious prosecution claim. (*Id.* at 12.) While there is no freestanding claim for malicious prosecution, the initiation of charges could give rise to a constitutional claim though if the "initiation of a criminal charges without probable cause set[] in force events that run afoul of explicit constitutional protection[.]" (*Id.* at 13 (citing *Castellano v. Fragozo*, 352 F.3d 939, 953–54 (5th Cir. 2003)).) Here, "Payton was seized and arrested based on charges Anderson initiated by affidavit and an ensuing warrant lacking probable cause. Payton was jailed and later forced to appear and defend against the charges until they were ultimately dropped by the prosecutor." (*Id.* at 13.)

### 3. The Town's Reply (Doc. 110)

Maringouin replies that the key is the fact that Anderson filed a complaint because he believed he had been defamed by Plaintiff and thought he had the right to file it. (Doc. 110 at 1.) Anderson did not file a warrant but rather a complaint with the Justice of the Peace, who wrote and signed the warrant to arrest. (*Id.* (citations omitted).) Thus, Plaintiff, is, according to the Town, wrong because 1) Anderson did not file for a warrant, and 2) Anderson had a right to file a complaint for criminal defamation. (*Id.* at 1–2.) The Town says of *Snyder*:

> We agree the statute is unconstitutional as written because it does not include the language of actual malice established in *N.Y. Times Co. v. Sullivan*. However, this does not mean that criminal defamation is unconstitutional in its entirety in Louisiana and public officials do not have viable claims for criminal defamation. It simply means that courts must apply the language of the US Supreme Court rather than the textual language of the statute. . . .
>
> Thus, as stated by the Court in *Snyder*, "the constitutional privilege relating to public officials, public figures, and private individuals' involvement in an event or issue of wide public interest as announced in the cited decisions of the United States Supreme Court is part of the Louisiana defamation statute. In short, a charge of defamation is well founded as to these subjects only when the statement was made with actual malice, that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Snyder*, 277 So.2d 660, 665

(*Id.* at 3.) Thus, the Town claims that Anderson believed he was defamed and followed the correct protocol. "He spoke with the Justice of the Peace, who then on his own volition made the decision to fill out multiple affidavits and arrest warrants for the plaintiff based on the multiple complaints filed by the Chief and the three other party defendants." (*Id.* at 3.) The Justice of Peace believed there was probable cause based on the affidavits of Anderson (who said Plaintiff "sen[t] a malicious prosecution to business' with false statements about Hosea Anderson") and the private individual affidavit, which referenced sending a letter to Edward James's boss with false

statements. (*Id.* at 3–4 (citing Exs. 11, 12 to Anderson Dep., Doc. 102-3).)  The Town urges that, "[w]here the government brings criminal defamation charges against a speaker based on his speech about a public official, the government bears the burden of proving that the speaker acted with actual malice." (*Id.* at 4 (citing *Anderson*, 2017 WL 3064805, at *6 (citation omitted) (alteration in original)).)

Maringouin urges again that it did not fail to train officers on the criminal defamation statute, as there is a viable claim under that statute, and Anderson engaged in no conduct that created a policy for the Town. (*Id.* at 4–5.)

### C.  Parties' Arguments: *A&D MSJ*

#### 1. Anderson and Davis's Original Memorandum (Doc. 102-2)

Anderson and Davis begin by emphasizing that La. Rev. Stat. Ann. § 14:47 was not held by *Snyder* to be per se unconstitutional but rather "was only unconstitutional insofar as it attempted to punish public expression and publication concerning public officials, public figures and private individuals who are engaged in public affairs." (Doc. 102-2 at 7.)  *Snyder* did not, according to these defendants, declare the entire statute to be unconstitutional.  Further:

> [T]o date, the Louisiana Supreme Court has not held La. R.S. 14:47 to be unconstitutional but rather has held that application of that statute in situations involving public expression about public officials or those involved in public affairs to be unconstitutional. Although *Snyder* was decided in 1973, to date La. R.S. 14:47 remains in the Louisiana Revised Statutes and has not been amended.

(*Id.* at 8.)

Anderson and Davis then turn to the question of qualified immunity, asking (1) whether it was clearly established that the statute could not be used as the basis to arrest someone who makes false statements about a *private* individual and (2) whether there was probable cause to arrest

Payton for defamation. (*Id.* at 6, 10.) *Snyder* did not address defamation directed at purely private individuals, and the *Snyder* court stated as much. (*Id.* at 9.) Indeed, La. Rev. Stat. Ann. § 14:47 "is still 'on the books' " and was recently addressed in *State in Interest of G.J.G.*, 2019-768 (La. App. 3 Cir. 3/4/20); 297 So. 2d 120. (*Id.*) Thus, "to find that Defendants should have known that the defamation statute was unconstitutional—even assuming it is—would require them to have the knowledge and training of a lawyer rather than a reasonable police officer and 'intuit' from researching the law that the statute was unconstitutional." (*Id.*) Anderson and Davis urge that this would "improperly shift the focus of the qualified immunity inquiry from whether it was objectively reasonable for Defendants to believe the statute was in force and effect to whether the statute was in fact unconstitutional." (*Id.* (citing *Amore v. Novarro*, 624 F.3d 522, 532–34 (2d Cir. 2010).) Without "controlling authority on point" or a "robust consensus" that the defamation statute is "unconstitutional as applied to false statements made about private individuals," Plaintiff cannot overcome qualified immunity. (*Id.* at 10 (citations omitted).)

Anderson and Davis next argue that there was probable cause to arrest Plaintiff. (*Id.*) The key question is whether the *arrest* was valid and whether there was probable cause for *any* of the charges. (*Id.*) Here, there was probable cause from the information available to Anderson and the Justice of the Peace, including the statements given by the three complaining witnesses. (*Id.* at 11.) Further, even if there was no probable cause, these Defendants would be entitled to qualified immunity. (*Id.* at 12.) As the Eleventh Circuit has recognized, the question is whether there was "arguable probable cause," not whether Plaintiff could be convicted of the crime. (*Id.* at 12–13 (quoting *Scarbrough v. Myles*, 245 F.3d 1299, 1302–03 (11th Cir. 2001)).)

### *2. Plaintiff's Opposition to the A&D MSJ (Doc. 107)*

Plaintiff first responds that the arrests were facially invalid because the Justice of the Peace who issued the warrants had no jurisdiction outside of Iberville Parish. (Doc. 107 at 1.)  Thus, Simpson could not sign arrest warrants for crimes in West Baton Rouge Parish. (*Id.* at 1–2.) Plaintiff urges that Anderson knew that Simpson's warrants were lacking lawful authority. (*Id.* at 2.)

Further, the "warrants are all 'barebones' in the extreme," as:

> None of the affidavits describe what the false statements were, how the statements were false, that Payton knew they were false, or that Payton acted with malice and, if so, the factual basis for such an assertion. All of the affidavits falsely represent that Payton committed the crime in Iberville Parish.

(*Id.* at 2–3.)  Plaintiff relies on *Spencer v. Staton*, 489 F.3d 658 (5th Cir. 2007) for the proposition that Anderson and Davis are not entitled to qualified immunity for relying on sham, barebones warrants. (Doc. 107 at 3.) While written statements can be supplemented with oral statements made under oath,  here (1) no oral statements were made under oath, and (2) the written statements (a) did not deal with the elements of defamation and (b) only dealt in part with the letter on which the arrest warrants were based. (*Id.* at 4.)

Plaintiff next asserts that there is no evidence that she defamed any defendant. (*Id.*)  There is no evidence that the letter was shown to the Justice of the Peace, and Anderson did not have this letter with him when he spoke to Justice of the Peace Simpson. (*Id.*)   Further, the letter was not defamatory as a matter of fact or law.  (*Id.*)  Plaintiff then goes through the letter to demonstrate how the statements made about Defendants were true and how statements made about others were opinions protected by the First Amendment. (*Id.* at 4–5.)

Plaintiff then contends that there was no probable cause to arrest her. (Doc. 107 at 6.) Again, Payton's statements are either true or opinion. (*Id.*) Moreover:

> Defendants' argument that the defamation statute is not unconstitutional as to false statements about private individuals is irrelevant because Payton made no false statements about any defendant. Further, it is a matter of dispute whether Ventress, Bourgeois, and James were purely private citizens or were instead private individuals engaged in matters of public interest and concern.

(*Id.* at 7.) Here, Ventress stated that Defendants received permission from the Town's Mayor to park the RJ trucks on the public property across from Plaintiff's home. (*Id.*) Thus, Plaintiff was objecting to the use of public property and a decision of the Mayor, and this was a matter of public concern. (*Id.*) In any event, "Defendants testified that their complaints were not about the letter after all." (*Id.*)

Plaintiff concludes:

> Anderson and Davis have not shown that they are entitled to summary judgment. It is undisputed that Payton could not defame Anderson as a matter of law and it should be undisputed that Payton did not defame any other Defendant, even arguably. Every factual statement Payton made in her letter to RJ's was true and her statements of opinion are not defamation and were directed at unnamed third parties in any event.
>
> According to the deposition testimony, Defendants cannot decide if they wanted Payton arrested because of her letter or for other reasons - reasons that they did not disclose in their affidavits submitted to Simpson.

(*Id.* at 12.)

### 3. Anderson and Davis's Reply (Doc. 109)

Anderson and Davis reply first that the Justice of the Peace had authority to issue the arrest warrant. (Doc. 109 at 1.) Louisiana Code of Criminal Procedure article 202 authorizes magistrates (including justices of the peace) to issue arrest warrants. (*Id.* at 2.) According to these defendants,

in *State v. Jenkins*, 338 So. 3d 276 (La. 1976), the Louisiana Supreme Court expressly rejected Plaintiff's arguments and held that Article 202 allows any magistrate to issue a warrant, regardless of whether he has jurisdiction. (Doc. 109 at 2.) Even if *Jenkins* did not defeat Plaintiff's argument completely, a reasonable officer would not know in light of *Jenkins* that his actions were unlawful, so qualified immunity would apply. (*Id.* at 3.)

Anderson and Davis next turn to *Spencer v. Staton*, asserting that this case does not support Plaintiff's argument that a "barebones" arrest warrant is invalid. (*Id.*) Rather, this case dealt with whether the affidavit upon which the warrant was issued could be "barebones." (*Id.*) The *Spencer* plaintiff did not argue that the warrant itself was barebones. (*Id.* at 3–4.) Additionally, a magistrate is entitled to rely on oral statements made to him to justify the issuance of the warrant. (*Id.* at 4.) Anderson and Davis then describe the statements made by Ventress and Bourgeois and highlight how these two as well as James and Anderson spoke with the Justice of the Peace before the warrant was issued. (*Id.* at 4–5.) In any event, even if the warrant was not valid, there was still probable cause for the arrest. (*Id.* at 5.) Anderson and Davis re-urge the above statements and argue that malice can be inferred from the circumstances. (*Id.* at 6.)

These defendants next claim that there is no legal or factual support for the position that La. Rev. Stat. Ann. § 14:47 is unconstitutional for all matters of public concern. (*Id.*) Rather, *Snyder* only dealt with individuals engaged in "public affairs," not matters of public interest or concern. (*Id.* at 6–7.) In any event, there is no evidence that these individuals were engaged in "public affairs." (*Id.* at 7.) Rather, they were "simply doing a job for their private employer." (*Id.*) These defendants assert:

> Clearly, *Snyder* is not broad enough to include a single private citizen's complaints about other private citizens who have permission from local government to be on public property to perform a private job. In addition, the statements Plaintiff made that

the individuals complained were false and that formed the basis for probable cause for her arrest, do not mention a thing about the individuals parking on public property. Further, the complaining witnesses disputed her claims that they were in a gang, were "trucking terrorists," were harassing her on her job, and were following her from her job. Clearly, there is no basis in law or in fact for Plaintiff's argument that her arrest for defamation of the individuals was unconstitutional under *Snyder*.

(*Id.*)

Anderson and Davis next dispute that they had an obligation to investigate whether the allegations of defamation were true before arresting her. (Doc. 109 at 7.)   To the contrary, there is no requirement that an arresting officer look into the allegations of a warrant to determine if they are true or false. (*Id.* at 7–8.)  Defendants conclude:

> "Police officers are not expected to be lawyers or prosecutors." [*Scarbrough v. Myles*, 245 F.3d 1299, 1302-03 n.8 (11th Cir. 2001).] A warrant issued "by a non-biased magistrate is the 'clearest indication' that officers proceeded 'in an objectively reasonable manner.'" *United States v. Triplett*, 684 F.3d 500, 504 (5th Cir. 2012) (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 547 . . . (2012)). Payton has not come forward with evidence to demonstrate that probable cause to arrest her was lacking.

(*Id.* at 8.)

### D. Claims Against the Town

#### 1. Municipal Liability Generally

"Section 1983 offers no *respondeat superior* liability." *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002).  "Municipalities face § 1983 liability 'when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury. . . .' " *Id.* (quoting *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 694 (1978)). That is, "[a] municipality is liable only for acts directly attributable to it 'through some official action or imprimatur.' " *Valle*, 613 F.3d at 541 (quoting *Piotrowski v.*

*City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)). "To establish municipal liability under § 1983, a plaintiff must show the deprivation of a federally protected right caused by action taken 'pursuant to an official municipal policy.' " *Id.* (quoting *Monell*, 436 U.S. at 691). The Plaintiff must demonstrate "(1) an official policy (or custom), of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom." *Id.* at 541–42 (quoting *Pineda*, 291 F.3d at 328).

"A municipality is liable under § 1983 for a deprivation of rights protected by the Constitution or federal laws that is inflicted pursuant to official policy." *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir.), *on reh'g,* 739 F.2d 993 (5th Cir. 1984). "The existence of a policy can be shown through evidence of an actual policy, regulation, or decision that is officially adopted and promulgated by lawmakers or others with policymaking authority." *Valle*, 613 F.3d at 542 (citing *Burge v. St. Tammany Parish,* 336 F.3d 363, 369 (5th Cir. 2003)).[7] "[A] single decision by a policy maker may, under certain circumstances, constitute a policy for which a [municipality] may be liable." *Id.* (citing *Brown v. Bryan County,* 219 F.3d 450, 462 (5th Cir. 2000)). "However, this 'single incident exception' is extremely narrow and gives rise to municipal liability only if the municipal actor is a final policymaker." *Id.* (citing *Bolton v. City of Dallas,* 541 F.3d 545, 548 (5th Cir. 2008)). Plaintiffs must demonstrate that the alleged policymakers "had

---

[7] Of course, the second category of "official policy" is:

> A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority. Actions of officers or employees of a municipality do not render the municipality liable under § 1983 unless they execute official policy as above defined.

*Webster*, 735 F.2d at 841.

final policymaking authority and that his decision was the moving force behind the constitutional injury." *Id.* at 543. For example, in *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986), the Supreme Court found that the court of appeals erred in dismissing petitioner's claim against a county when the Prosecutor, the relevant final policymaker, "made a considered decision based on his understanding of the law and commanded the officers forcibly to enter petitioner's clinic[,]" and "[t]hat decision directly caused the violation of petitioner's Fourth Amendment rights." *Id.* at 484.

"The third prong requires a plaintiff to prove 'moving force' causation." *Valle*, 613 F.3d at 542. "To succeed, 'a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.' " *Id.* (quoting *Bd. of the County Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)). "That is, 'the plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision.' " *Id.* (quoting *Brown*, 520 U.S. at 411, 117 S. Ct. 1382). "Deliberate indifference is a high standard—'a showing of simple or even heightened negligence will not suffice.' " *Id.* (quoting *Piotrowski*, 237 F.3d at 579).

Again, Plaintiff bases her claim on this single decision exception[8] and argues three underlying constitutional violations by Anderson: (1) retaliation under the First Amendment; (2) false arrest under the Fourth Amendment; and (3) malicious prosecution under the Fourth Amendment. As will be demonstrated below, Plaintiff has failed to create a question of fact on any of these alleged violations.

---

[8] The Town does not dispute that Anderson is the final policymaker for Maringouin for the challenged activity.

### *2. Malicious Prosecution Claim*

"[The] Fifth Circuit [does] not recognize an independent claim for malicious prosecution outside of any violations of a defendant's constitutional rights." *Anokwuru v. City of Hous.*, 990 F.3d 956, 964 (5th Cir. 2021). As the Fifth Circuit has said:

> The initiation of criminal charges without probable cause may set in force events that run afoul of explicit constitutional protection—the Fourth Amendment if the accused is seized and arrested, for example, or other constitutionally secured rights if a case is further pursued. Such claims of lost constitutional rights are for violation of rights locatable in constitutional text, and some such claims may be made under 42 U.S.C. § 1983. Regardless, they are not claims for malicious prosecution and labeling them as such only invites confusion.

*Castellano v. Fragozo*, 352 F.3d 939, 953–54 (5th Cir. 2003) (en banc). Thus, "[t]here is no freestanding right under the Constitution to be free from malicious prosecution." *Anokwuru*, 990 F.3d at 964 (citing *Morgan v. Chapman*, 969 F.3d 238, 245–46 (5th Cir. 2020) and *Castellano*, 352 F.3d at 953 ("[C]ausing charges to be filed without probable cause will not without more violate the Constitution. So defined, the assertion of malicious prosecution states no constitutional claim.")).

Given this clear holding by the Fifth Circuit, the Court finds that Plaintiff has no viable constitutional claim for malicious prosecution. Plaintiff must instead base any such claim on false arrest.

### *3. False Arrest Claim*

#### *a.* Introduction

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause,

> supported by Oath or affirmation, and particularly describing the
> place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. "To prevail on a § 1983 false arrest claim, [Plaintiff] must show 'that [the officers] did not have probable cause to arrest [her].' " *Anokwuru*, 990 F.3d at 963 (quoting *Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 655 (5th Cir. 2004)); *see also Brown v. Lyford*, 243 F.3d 185, 189 (5th Cir. 2001) (internal quotation marks omitted) ("The constitutional tort of false arrest . . . require[s] a showing of no probable cause."). "Probable cause is deemed to exist 'where the facts and circumstances within the affiant's knowledge, and of which he has reasonable trustworthy information, are sufficient unto themselves to warrant a man of reasonable caution to believe that an offense has been or is being committed.' " *United States v. Melancon*, 462 F.2d 82, 89 (5th Cir. 1972) (citing *United States v. Rich*, 407 F.2d 934, 936 (5th Cir. 1969)). *See also Kohler v. Englade*, 470 F.3d 1104, 1109 (5th Cir. 2006) ("Probable cause [for a search warrant] exists when there are reasonably trustworthy facts which, given the totality of the circumstances, are sufficient to lead a prudent person to believe that the items sought constitute fruits, instrumentalities, or evidence of a crime." (citing *Illinois v. Gates*, 462 U.S. 213, 238–39 (1983)).

"Fourth Amendment reasonableness 'is predominantly an objective inquiry.' " *Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011) (quoting *Indianapolis v. Edmond*, 531 U.S. 32, 47 (2000)). "We ask whether 'the circumstances, viewed objectively, justify [the challenged] action.' " *Id.* (alteration in original) (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978)). "If so, that action was reasonable 'whatever the subjective intent' motivating the relevant officials." *Id.* (quoting *Whren v. United States*, 517 U.S. 806, 814 (1996)). "This approach recognizes that the Fourth Amendment regulates conduct rather than thoughts, and it promotes evenhanded, uniform enforcement of the law." *Id.* (citing *Bond v. United States*, 529 U.S. 334, 338, n.2 (2000) and *Devenpeck v. Alford*, 543 U.S. 146, 153–54 (2004)).

Additionally, "if facts supporting an arrest are placed before an independent intermediary such as a magistrate or grand jury, the intermediary's decision breaks the chain of causation for false arrest, insulating the initiating party." *Anokwuru*, 990 F.3d at 963 (quoting *Deville v. Marcantel*, 567 F.3d 156, 170 (5th Cir. 2009)). "But that shield against liability, known in this circuit as the independent-intermediary doctrine, is not absolute. There are two ways to overcome the doctrine relevant[.]" *Mayfield v. Currie*, 976 F.3d 482, 487 (5th Cir. 2020), *as revised* (Sept. 23, 2020). The first, relevant here, comes from *Malley v. Briggs*, 475 U.S. 335, 344–45 (1986), where "the Supreme Court held that an officer can be held liable for a search authorized by a warrant when the affidavit presented to the magistrate was 'so lacking in indicia of probable cause as to render official belief in its existence unreasonable.' " *Mayfield*, 976 F.3d at 487 (quoting *Malley*, 475 U.S. at 344–45). "The *Malley* wrong is not the presentment of false evidence, but the obvious failure of accurately presented evidence to support the probable cause required for the issuance of a warrant." *Id.* (quoting *Melton v. Phillips*, 875 F.3d 256, 264 (5th Cir. 2017) (en banc) (citing *Michalik v. Hermann*, 422 F.3d 252, 261 (5th Cir. 2005))). "The question to be asked, under *Malley*, is whether a reasonably well-trained officer in [the officer's] position would have known that his affidavit failed to establish probable cause and that he should not have applied for a warrant." *Id.* (quoting *Jennings v. Joshua Indep. Sch. Dist.*, 877 F.2d 313, 317 (5th Cir. 1989) (internal quotation marks and citation omitted)).

Here, the relevant statute is La. Rev. Stat. Ann. § 14:47. This law provides:

> Defamation is the malicious publication or expression in any manner, to anyone other than the party defamed, of anything which tends:
>
> (1) To expose any person to hatred, contempt, or ridicule, or to deprive him of the benefit of public confidence or social intercourse; or

(2) To expose the memory of one deceased to hatred, contempt, or ridicule; or

(3) To injure any person, corporation, or association of persons in his or their business or occupation.

Whoever commits the crime of defamation shall be fined not more than five hundred dollars, or imprisoned for not more than six months, or both.

*Id.*

Having carefully considered the matter, the Court finds that Plaintiff has no viable false arrest claim against Anderson (and thus the City). In sum, though Plaintiff is correct in her characterization of *Snyder* and the fact that Anderson's statement and affidavit do not support a finding of probable cause, the moving defendants are correct that there is probable cause to arrest from the statement and affidavit of Ventress and from the independent-intermediary doctrine. This probable cause is fatal to Plaintiff's arrest claim against Anderson and the Town.[9]

> *b.* Whether Anderson's Statement and Affidavit Support a Finding of Probable Cause

First, the Court finds that there is a question of fact as to whether the independent-intermediary doctrine applied to Anderson and whether probable cause supported Anderson's warrant. This issue largely turns on the Louisiana Supreme Court's decision in *Snyder*.

By way of background, "[i]n *Garrison v. Louisiana*, the Supreme Court held that the Louisiana criminal defamation statute, La. [Rev. Stat. Ann. §] 14:47, is unconstitutional 'in the context of criticism of the official conduct of public officials.' " *McLin v. Ard*, 866 F.3d 682, 695 (5th Cir. 2017) (quoting *Garrison v. Louisiana*, 379 U.S. 64, 77 (1964)). The *Garrison* "court explained that only 'false statement[s] "made with actual malice—that is, with knowledge that it

---

[9] For the same reasons, as stated below, any false arrest claim against Davis fails as well.

was false or with reckless disregard of whether it was false or not" ' —are unprotected under the First Amendment and validly subject to criminal prosecution." *Id.* (quoting *Garrison*, 379 U.S. at 67 (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964))). "The Louisiana statute runs afoul of this limitation because it 'punishes false statements without regard to that test if made with ill-will; even if ill-will is not established, a false statement concerning public officials can be punished if not made in the reasonable belief of its truth.' " *Id.* (quoting *Garrison*, 379 U.S. at 78).

In *Snyder*, "[t]he Louisiana Supreme Court then went one step further[.]" *Anderson v. Larpenter*, 2017 WL 3064805, at *11 (citing *Snyder*, 277 So. 2d. 668). Because the parties dispute the holding and consequences of *Snyder*, a larger discussion of that case is warranted.

In *Snyder*, the Louisiana Supreme Court originally reviewed Louisiana's public defamation statute and found that, though it failed to include the United States Supreme Court's limitations for public officials, public figures, and private individuals involved in "an event or issue of wide public interest," the statute was "not unconstitutional per se, but . . . may be susceptible of a limiting construction, in accordance with the holdings of *New York Times*, *Garrison*, and [*Moity v. Louisiana*, 379 U.S. 201 (1964)]." *Snyder*, 277 So. 2d at 664 (quoting in part *Snyder v. Ware*, 314 F. Supp. 335 (D. C. 1970), *aff'd*, 397 U.S. 589 (1970)). The Louisiana Supreme Court stated:

> We hold that the constitutional privilege relating to public officials, public figures, and private individuals' involvement in an event or issue of wide public interest as announced in the cited decisions of the United States Supreme Court is part of the Louisiana defamation statute. In short, a charge of defamation is well founded as to these subjects only when the statement was made with actual malice, that is, with knowledge that it was false or with reckless disregard of whether it was false or not.

*Id.* at 665.

However, on rehearing, the Louisiana Supreme Court changed direction and said:

It is clear from a reading of these statutes that truth is not a defense to the charge of defamation in Louisiana. When a statute is clear and unambiguous but unconstitutional in being so broad as to infringe upon constitutional rights guaranteed by the First Amendment, we cannot distort the clear expression of the Legislature by redrafting the statute to eradicate its overbroad application. It is for the Legislature to correct such a constitutional infirmity.

We hold R.S. 14:47, 48, and 49 to be unconstitutional insofar as they attempt to punish public expression and publication concerning public officials, public figures, and private individuals who are engaged in public affairs.

*Id.* at 668. But the Court noted:

We are limited in our consideration here to public expression directed at a public figure or one involved in public affairs. Our remarks cannot therefore be extended under this holding to defamatory statements concerning purely private individuals. However, it is well to note that when the 'clear and present danger' or 'fighting words' standard is not used for the purpose of defining the crime of defamation, the punishment of public expression as to private individuals through true statements, though made with 'actual malice' 'hatred, ill will or enmity or a wanton desire to injure', may be constitutionally infirm.

*Id.* at 668 n.2.

Considering *Snyder*, a reasonable juror could find that a reasonably trained officer in Anderson's position would have known that his affidavit failed to establish probable cause and that he should not have applied for a warrant given his status as a public official. As Judge Africk in the Eastern District has found, "the Louisiana Supreme Court has held that § 14:47 in its current form cannot apply to 'expression and publication concerning public officials' in *any* instance— *i.e.*, even where actual malice is present." *Anderson v. Larpenter*, 2017 WL 3064805, at *10 (citing *Snyder*, 277 So.2d at 668). "Therefore, § 14:47 simply cannot apply to [Plaintiff's] statements about [Anderson]—whether true or false, whether made with innocent intent or made with actual malice." *Id. See also McLin*, 866 F.3d at 695 ("Speech criticizing the official conduct of public

officials is protected by the First Amendment and does not constitute criminal defamation." (citing, *inter alia*, *Snyder*, 277 So. 2d at 665)). As a result, Anderson and the Town cannot rest their defense on Anderson's statement and affidavit.

> *c.* Whether Ventress's Statements and Affidavits Support a Finding of Probable Cause and the Application of the Independent-Intermediary Doctrine

Though the Town cannot rely on Anderson's statement and affidavit, Maringouin can turn to Ventress's statement and affidavit. This is because "[c]laims for false arrest focus on the validity of the arrest, not on the validity of each individual charge made during the course of the arrest." *Porter v. Lear*, 751 F. App'x 422, 430 (5th Cir. 2018) (quoting *Price v. Roark*, 256 F.3d 364, 369 (5th Cir. 2001)). " '[I]f there was probable cause for any of the charges made . . . then the *arrest* was supported by probable cause, and the claim for false arrest fails.' " *Id*. at 430–31 (quoting *Price*, 256 F.3d at 369 (quoting *Wells v. Bonner*, 45 F.3d 90, 95 (5th Cir. 1995))).

Thus, for example, in *Porter*, plaintiffs accused officers of falsifying an affidavit for an arrest warrant related to armed robberies to obtain a search warrant for plaintiff's house. *Id.* at 424, 429. The Fifth Circuit rejected the argument, finding, "even if it had been obvious to Lear[, who wrote the affidavits for the warrant,] that [plaintiff] Porter did not commit the robberies when he saw him after the search, Lear still had probable cause to arrest Porter for illegal possession of stolen things under La. Stat. Ann. § 14:69(B) based on the handgun and cell phone found in Porter's house." *Id.* at 431.

In light of this, Plaintiff's false arrest claim against the Town (and Anderson) turns on whether there was probable cause for *any* of the charges supporting Plaintiff's arrest and whether the independent-intermediary doctrine applied. In short, the Court finds that all reasonable jurors

would conclude that there was probable cause and that the independent-intermediary doctrine did apply.

Ventress testified that Simpson wrote the affidavit based on what Ventress filled out in the Voluntary Statement. (Ventress Dep. 107–110, Doc. 102-6.) The Voluntary Statement stated in relevant part that Plaintiff "mail [sic] a letter to my job with false statement about me. She acuse [sic] me of being over gang, harassing her on her job, and follow her [sic] from her job." (*A&D SUF* ¶ 11, Doc. 102-1.) Additionally, in the letter, Plaintiff wrote in relevant part:

> These three individuals' [(including Ventress)] families and friends formed what is now known as the Maringouin Mob, which consist of the 1500 Gang, along with thugs, lowlife, and other blithering idiots of the adjoining communities.
>
> As I can appreciate it, many of these individuals are on public assistance and are receiving some monetary reward to harass and intimidate me.
>
> These individuals come to my job daily and are regularly disruptive. They follow me to and from work and all points in between.

(Payton Dep. 56, Doc. 102-4; Ex. 3 to Payton Dep., Doc. 102-5 at 73.)

Plaintiff maintains that the letter contains only truth and opinion, and some of the letter does fall into those categories. Specifically, a reasonable juror could conclude from the chemical placards on the trucks that chemicals were being stored there, even if Ventress denied it. (Ventress Dep. 82, Doc. 102-6.) Further, a reasonable juror could also find that Plaintiff was expressing an opinion in mentioning "thugs, low life, and other blithering idiots." *See Tingle v. Hebert*, 305 F. Supp. 3d 678, 692–93 (M.D. La. 2018) (deGravelles, J.) (discussing distinction between permissible and impermissible opinion).

However, no reasonable juror could find that other statements made by Plaintiff were true or were mere opinion. Each of the other statements is a specific assertion of fact, and no reasonable juror would find them to be opinion. As *Tingle* explained:

> A pure statement of opinion, which is based totally on the speaker's subjective view and which does not expressly state or imply the existence of underlying facts, usually will not be actionable in defamation[.] That is because falsity is an indispensable element of any defamation claim, *see Cangelosi v. Schwegmann Bros.*, 390 So.2d 196, 198 (La. 1980), and a purely subjective statement can be neither true nor false. Of course, statements of opinion are usually not made in a vacuum, without an express or implied reference to underlying facts. Even if no facts are expressly stated, the opinion may give rise to an unspoken inference that certain facts are true. *Mashburn*, 355 So.2d at 885–86. For example, if a person states that "In my opinion, Mr. Smith is a thief," the inference is that the speaker is aware of facts which support his opinion. Such a statement, though couched in terms of an opinion, could certainly give rise to a defamation action.

*Id.* (quoting *Bussie v. Lowenthal*, 535 So.2d 378, 381 (La. 1988)). Here, Plaintiff clearly implies the existence of underlying facts by stating (1) that Ventress is a member of a specific gang; (2) that many of his gang are on public assistance; and (3) many receive money to harass and intimidate Plaintiff.

Further, all reasonable jurors would find that such statements were false. While Plaintiff testified whom she thought the 1500 Gang was ("a gang of boys who were guarding the trucks"), she was not sure if she had any evidence the truck drivers (including Ventress) were in the alleged gang. (Payton Dep. 125–26, Doc. 102-5.) She also admitted that, in the letter, she "call[ed] the truck drivers mobsters and members of the Maringouin Mob[.]" (*Id.* at 124–125.) When asked if she had any evidence that Ventress and the other truck drivers were in cahoots with the "thugs," she said:

> I'm only basing that upon their behavior. These are people I don't know, and I'm just basing it upon their behavior. . . . That would

> have to be a case-by-case basis, and so I am not sure of all the
> individuals who I've referenced. But, like I said, Maringouin is very
> related individuals.

(*Id.* at 126–27.) Lastly, Plaintiff had no knowledge that the truck drivers are on public or government assistance (though she denied saying they received it), and she was "unsure" that "the truck drivers were receiving a monetary reward to harass and/or intimidate [her]." (*Id*. at 127–28.) Considering all of this, no reasonable juror could find that the above statements were true. Thus, even if the warrants were invalid, the arrest was still lawful because there was probable cause to arrest Plaintiff for publicly defaming Ventress.

Plaintiff's other arguments on why there was no probable cause also fail as a matter of law. First, Plaintiff maintains that she was merely making statements on matters of "public affairs." (Doc. 107 at 7.) Even if a reasonable juror could reach this conclusion (a shaky proposition, based merely on the Mayor's alleged permission for the truck drivers to park where they did), the allegedly false statements—that Ventress was a member of a gang, received public assistance, harassed her, and received money to do so—go well beyond what can reasonably be described as "public affairs."[10]

---

[10] Neither party cites case law as to what constitutes "public affairs" within the meaning of *Synder*. However, as one Louisiana appellate court has stated in the context of the state's anti-SLAPP statute:

> Speech in relation to a matter of public concern is speech "relating to any matter of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146, 103 S. Ct. 1684, 1690, 75 L. Ed. 2d 708 (1983); [*Shelton v. Pavon*, 17-0482 (La. 10/18/17); 236 So.3d 1233, —— (2017 WL 4737111)]. Suits involving private disputes between private parties generally fall outside the ambit of Article 971. *Shelton*, —— So.3d at ——. To determine if speech is a matter of public concern, the court must consider the content, form, and context of the statements as revealed by the entire record. See *Connick*, 103 S. Ct. at 1690.

*Breen v. Holmes*, 2016-1591 (La. App. 1 Cir. 12/7/17); 236 So. 3d 632, 636, *writ denied*, 2018-0049 (La. 3/2/18); 269 So. 3d 708 (finding that comments related to a woman's shooting of her husband and whether she should be criminally prosecuted for killing him was a matter of public concern). Thus, again, comments about the trucks parking across the street arguably constitute matters of public concern, while issues related to Ventress's being a member of a specific gang, receiving public assistance, and being paid to harass Plaintiff would not. Indeed, Plaintiff does not argue beyond conclusions that these specific statements were matters of public concern. Rather, as discussed elsewhere, she contends that they were not about Ventress or were otherwise true. (*See* Doc. 107 at 6–8.)

Second, Plaintiff also contends that her statements about public assistance and paid harassments did not apply to Ventress and the other drivers. But no reasonable juror could reach this conclusion from the wording of the letter. Plaintiff's statement that "many" in the gang qualify as such naturally includes Ventress and the other drivers, and there is no other reasonable reading of the letter.

And third, Plaintiff argues that Ventress did not complain about Plaintiff because of the letter and that the letter was not shown to the Justice of the Peace. (*See* Ventress Dep. 66–67, Doc. 102-6.) Putting aside the fact that Ventress also testified that he filed charges on October 17th saying that Plaintiff defamed him because "[s]he sent a letter to [his] . . . job . . . RJ's Transportation . . ., with false statements and stuff," (*id.* at 81), as shown above, probable cause is an objective inquiry, and subjective intent is irrelevant, *see al-Kidd*, 563 U.S. at 736. Further, even if the letter was not shown to the Justice of the Peace, that does not change the fact that the voluntary statements still reflect, based on the letter, that false statements were made about Ventress.

In sum, there was probable cause to support Plaintiff's arrest. Given the totality of the circumstances (including Ventress's voluntary statement and Plaintiff's letter), there was reasonably trustworthy facts to lead a reasonably prudent person to believe that the offense of defamation had been committed against Ventress. *See Melancon*, 462 F.2d at 89; *Kohler*, 470 F.3d at 1109. No reasonable juror could find otherwise. Consequently, Plaintiff's false arrest claim fails as a matter of law.

Additionally, even if there was not probable cause, the independent-intermediary doctrine would defeat Plaintiff's false arrest claim. As amply demonstrated above, Ventress's statements and affidavit were presented before a neutral magistrate judge, and the Justice of the Peace

determined there was probable cause. Consequently, the chain of causation was broken for Plaintiff's false arrest claim.

Plaintiff relies on *Spencer v. Staton*, 489 F.3d 658 (5th Cir. 2007), *opinion withdrawn in part on reh'g on other ground* (July 26, 2007) to defeat the independent-intermediary doctrine. There, the Fifth Circuit found that a warrant application was "a textbook example of a facially invalid, 'barebones" affidavit" because, "[a]fter reciting [plaintiff's] biographical and contact information, the affidavit state[d] nothing more than the charged offense, accompanied by a conclusory statement that [plaintiff] assisted her husband and [another] in evading Louisiana authorities." *Id.* at 661–62. The Fifth Circuit found that this affidavit did "not supply the factual basis for probable cause necessary for issuance of an arrest warrant." *Id.* at 662. The officer asserted that "he supplemented the affidavit with oral testimony based on his personal knowledge and investigation such that—in the aggregate—the information conveyed to the judge supports probable cause for [plaintiff's] arrest." *Id.* The Fifth Circuit recognized that, "[b]ecause the Fourth Amendment does not require written warrants, an otherwise invalid warrant can be rehabilitated by sworn oral testimony before a judicial officer given contemporaneously upon presentation of the warrant application." *Id.* (citing *United States v. Hill*, 500 F.2d 315, 320 (5th Cir. 1974) ("It has been accepted principle in this and other circuits that a federal court . . . may consider an affiant's oral testimony, extrinsic to the written affidavit, which is sworn before the issuing magistrate, in determining whether the warrant was founded on probable cause."); *Lopez v. United States*, 370 F.2d 8, 10 (5th Cir. 1966) ("probable cause analysis may take into account information 'brought to the magistrate's attention . . . in the form of oral statements'")). But, in *Spencer*, the Fifth Circuit found:

The record in this case, after careful review, reveals significant uncertainty concerning what oral testimony [the officer] imparted to the issuing judge, and when he did so. The judge's and [officer's] sworn deposition statements are insufficient to demonstrate as a matter of law that [officer's] testimony constituted "sufficient information to support an independent judgment that probable cause exists for the warrant." *Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 564 . . . (1971). Moreover, [the officer] does not allege that the statements he provided were made under oath. . . .

For purposes of qualified immunity, the evidence in the record does not establish that, as a matter of law, a reasonable police officer could have believed the evidence he had was sufficient to constitute probable cause, justifying a warrant, for [plaintiff's] arrest. The district court thus erred in finding the warrant constitutionally sufficient to justify Spencer's arrest.

*Spencer*, 489 F.3d at 662–63.

Plaintiff's reliance on *Spencer* is misplaced. While a reasonable juror could find that Ventress and the others' affidavits were "barebones" in this case, *Spencer* acknowledges that the Justice of the Peace could rely on the other statements made to him, provided they were made under oath. Here, the magistrate judge had such testimony in the Voluntary Statements completed by Ventress and the others. (Exs. 11, 13 to Anderson Dep., Doc. 102-3 at 251, 253; Ex. 2 to Ventress Dep., Doc. 102-6 at 114.) The Voluntary Statement form contained typed language above the written part saying that the person making the declaration did so "of [his] own free will, *knowing that such statement could later be used against [him] in any court of law*, and [he] declare[d] that this statement [was] made without any threat, coercion, offer of benefit, favor or offer of favor, leniency or offer of leniency by any person or persons whomsoever." (Exs. 11, 13 to Anderson Dep., Doc. 102-3 at 251, 253; Ex. 2 to Ventress Dep., Doc. 102-6 at 114 (emphasis added).) Further, above the signature line at the bottom, the truckers certified that "the facts contained [in the statement] are true and correct." (Exs. 10, 12 to Anderson Dep., Doc. 102-3 at 250, 252; Ex. 2 to Ventress Dep., Doc. 102-6 at 114.) Plaintiff has pointed to no cases

demonstrating that this does not satisfy the oath requirement or cannot serve as the basis for the issuance of a warrant. In any event, the Warrant of Arrest itself states that "Complaint has been made before me, *upon oath*, of Patrick Ventress, charging Cynthia Payton with RS 14:47 Defamation." (Ex. 1 to Ventress Dep., Doc. 102-6 at 113.) This document does not limit the "oath" to the complaint made solely in the Affidavit, and the only fair reading of the document is that Ventress's testimony in the Voluntary Statement was "upon oath" as well.

Plaintiff's final argument is easily dispensed with. She asserts that the Justice of the Peace lacked authority to issue the warrants because his jurisdiction lay in Iberville, but, as Anderson and Davis argue, this position was rejected by *State v. Jenkins*, 338 So. 2d 276 (La. 1976). In *Jenkins*, the defendant argued that "the warrant issued for his arrest was defective and that his arrest was therefore illegal" in part because "the judge issuing the warrant was the judge of the City Court, the jurisdiction of which [did] not extend to offenses prohibited by state law." *Id.* at 280. Then Justice Dennis wrote for the Louisiana Supreme Court that Louisiana Code of Criminal Procedure article 202 "authorizes 'any magistrate' to issue the warrant, and does not demand that the court in which he presides have jurisdiction of the matter." *Id.* Justice Dennis concluded, "Clearly, the City Judge of the City of Ruston is a magistrate within the meaning of the code, and had authority to issue the warrant for defendant's arrest." *Id.* Article 202 is substantially the same now as it was in the time of *Jenkins* in the parts relevant to these motions. *Compare id.* (quoting La. Code Crim. Proc. art. 202), *with* La. Code Crim. Proc. art. 202 (2021)). Thus, Plaintiff's argument about Simpson's jurisdiction is groundless.

Under the circumstances, Plaintiff has failed to create a question of fact on this issue; a reasonable juror could not find that no reasonably well-trained officer in any of these individual's position would have known that his affidavit failed to establish probable cause and that he should

not have applied for a warrant based on Ventress's complaint. *Cf. United States v. Lindsay*, 709 F. App'x 299, 300 (5th Cir. 2018) (per curiam) ("Given that affidavits must be construed in a commonsense manner, *see United States v. Ventresca*, 380 U.S. 102, 108 . . . (1965), with great deference given to a magistrate judge's determination of probable cause, the district court did not err in finding that the affidavit in the instant case was not bare bones.").

In sum, there was probable cause to arrest Plaintiff for defaming Ventress, and, consequently, any false arrest claim against Anderson is defeated. Further, the independent-intermediary doctrine breaks the chain of causation for any false arrest claim against Anderson in light of Ventress's complaint. Consequently, the Fourth Amendment false arrest claim cannot serve as the basis for a *Monell* claim against the Town.

### 4. First Amendment Retaliation Claim

As the Fifth Circuit has explained, "[t]o prevail on a First Amendment retaliation claim, Plaintiff must demonstrate that (1) he was engaged in constitutionally protected activity, (2) the officers' action caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the officers' adverse actions were substantially motivated against Plaintiff's exercise of constitutionally protected conduct." *Alexander v. City of Round Rock*, 854 F.3d 298, 308 (5th Cir. 2017) (citation omitted).

Thus, for instance, in *Alexander*, plaintiff claimed that officers retaliated against him for using an expletive in public. *Id.* The Fifth Circuit rejected this claim and affirmed the district court's dismissal, explaining:

> [A]ny adverse action that was taken once the arrest was effected cannot be reasonably attributed to Alexander's alleged use of an expletive, as Alexander was ultimately arrested for resisting a search and not for any unfortunate word choice. Thus, Alexander's First Amendment retaliation claim fails as far as his use of an expletive is concerned.

*Id.*

Similarly, Payton's claim fails for lack of causation. It is true that Anderson made a complaint against Payton for public defamation and that this complaint lacked probable cause. However, Plaintiff was ultimately arrested based on three other complaints by Ventress, James, and Bourgeois. As the Court already determined, there was probable cause to arrest Plaintiff based on the allegations of, at the very least, Ventress, and the neutral magistrate confirmed that there was probable cause. Thus, like *Alexander*, the Court finds as a matter of law that any First Amendment retaliation claim against Anderson fails for lack of causation.

### 5. Failure to Train and Supervise

#### a. Parties' Arguments

Plaintiff also asserts a *Monell* claim against the Town for failure to train and supervise with respect to "the lawful application of Louisiana's criminal defamation law and the lawful application of Louisiana law respecting fugitives from justice[.] . . . " (*Am. Compl.* ¶ 115, Doc. 16.) Plaintiff claims that her arrest and prosecution "was a plain and obvious consequence of this failure." (*Id.*) The Town seeks dismissal of this claim and provides citations to relevant law on the issue. (Doc. 100-1 at 7–9.)

Plaintiff's briefing on this issue is sparse. Her only real argument here is indirect: "Not only did Anderson fail to train Davis in the unconstitutionality of the defamation law – Anderson did not even know the law was unconstitutional – but Anderson himself directly caused Payton's injuries, thereby creating Maringouin's Section 1983 liability." (Doc. 106 at 10.) Plaintiff cites to no law for this claim.

#### b. Waiver

"The Fifth Circuit makes it clear that when a party does not address an issue in his brief to

the district court, that failure constitutes a waiver on appeal." *JMCB, LLC v. Bd. of Commerce & Indus.*, 336 F. Supp. 3d 620, 634 (M.D. La. 2018) (deGravelles, J.) (quoting *Magee v. Life Ins. Co. of N. Am.*, 261 F. Supp. 2d 738, 748 n.10 (S.D. Tex. 2003)); *see also JTB Tools & Oilfield Servs., L.L.C. v. United States*, 831 F.3d 597, 601 (5th Cir. 2016) (stating that, "[t]o avoid waiver, a party must identify relevant legal standards and 'any relevant Fifth Circuit cases' " and holding that, because appellant "fail[ed] to do either with regard to its underlying claims, . . . those claims [were] inadequately briefed and therefore waived." (citing *United States v. Skilling*, 554 F.3d 529, 568 n.63 (5th Cir. 2009) and *United States v. Scroggins*, 599 F.3d 433, 446–47 (5th Cir. 2010) (noting that it is "not enough to merely mention or allude to a legal theory")); *United States v. Reagan*, 596 F.3d 251, 254 (5th Cir. 2010) (defendant's failure to offer any "arguments or explanation . . . is a failure to brief and constitutes waiver.").

"By analogy, failure to brief an argument in the district court waives that argument in that court." *JMCB*, 336 F. Supp. 3d at 634 (quoting *Magee*, 261 F. Supp. 2d at 748 n.10); *see also United States ex rel. Wuestenhoefer v. Jefferson*, 105 F. Supp. 3d 641, 672 (N.D. Miss. 2015) ("This failure to develop the relevant argument effectively represents a waiver of the point." (citing *United States v. Dominguez–Chavez*, 300 F. App'x 312, 313 (5th Cir. 2008) ("Dominguez has failed to adequately raise or develop his due process and equal protection arguments in his appellate brief, and, thus, they are waived."); *El–Moussa v. Holder*, 569 F.3d 250, 257 (6th Cir. 2009) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in [a] skeletal way, leaving the court to put flesh on its bones."))); *see also Kellam v. Servs.*, No. 12-352, 2013 WL 12093753, at *3 (N.D. Tex. May 31, 2013), *aff'd sub nom. Kellam v. Metrocare Servs.*, 560 F. App'x 360 (5th Cir. 2014) ("Generally, the failure to respond to arguments

constitutes abandonment or waiver of the issue." (citations omitted)); *Mayo v. Halliburton Co.*, No. 10-1951, 2010 WL 4366908, at *5 (S.D. Tex. Oct. 26, 2010) (granting motion to dismiss breach of contract claim because plaintiff failed to respond to defendants' motion to dismiss on this issue and thus waived the argument).

Consequently, because Plaintiff failed to meaningfully oppose the Town's motion on the failure to train and supervise claims and failed to provide any substantive law in support, the Court will grant the Town's motion on those issues on the grounds of waiver. *See JMCB*, 336 F. Supp. 3d at 634 (finding that operative complaint could be dismissed because plaintiff failed to respond to the substance of defendant's arguments); *Apollo Energy, LLC v. Certain Underwriters at Lloyd's, London*, 387 F. Supp. 3d 663, 672 (M.D. La. 2019) (deGravelles, J.) (finding that policy exclusion could apply because plaintiff failed to oppose insurer's argument on the issue); *see also Wuestenhoefer*, 105 F. Supp. 3d at 672 (finding that relator waived argument as to how certain write-offs fell within a particular provision of the False Claims Act). Consequently, Plaintiff's *Monell* claims based on failure to train and supervise (and the similar claims made against Anderson individually) are dismissed.

Nevertheless, even if Plaintiff had not waived these claims, the Town and Anderson would be entitled to summary judgment on these issues. The Court now turns to the merits of these claims.

### c. Applicable Law

To establish a claim for a claim against a municipality for failure to train, "[a] plaintiff must show that (1) the municipality's training policy or procedure was inadequate; (2) the inadequate training policy was a 'moving force' in causing violation of the plaintiff's rights; and (3) the municipality was deliberately indifferent in adopting its training policy." *Valle*, 613 F.3d

at 544 (citation omitted). "All failure to act claims, such as . . . failure to train [or] supervise . . . involve the same basic elements: inadequacy, deliberate indifference, and causation." *Snow v. City of El Paso, Texas*, 501 F. Supp. 2d 826, 833 n.5 (W.D. Tex. 2006) (citations omitted).

"The failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." *Valle*, 613 F.3d at 544 (quoting *Bryan County*, 219 F.3d at 457). "In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform." *Id.* (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989)).

"[D]eliberate indifference is a stringent standard of fault, requiring [allegations] that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (second alteration added). Plaintiffs "must show that 'in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.' " *Valle*, 613 F.3d at 547 (quoting *City of Canton*, 489 U.S. at 390). In *Connick*, the Supreme Court summarized this standard as follows:

> Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. [*Bryan Cty.*, 520 U.S., at 407, 117 S. Ct. 1382.] The city's " 'policy of inaction' " in light of notice that its program will cause constitutional violations "is the functional equivalent of a decision by the city itself to violate the Constitution." *Canton*, 489 U.S., at 395, 109 S. Ct. 1197 (O'Connor, J., concurring in part and dissenting in part). A less stringent standard of fault for a failure-to-train claim "would result in *de facto respondeat superior* liability on municipalities ...." *Id*., at 392, 109 S. Ct. 1197; *see also Pembaur, supra*, at 483, 106 S. Ct. 1292 (opinion of Brennan, J.) ("[M]unicipal liability under § 1983 attaches where—and only where—a

deliberate choice to follow a course of action is made from among various alternatives by [the relevant] officials ... ").

A pattern of similar constitutional violations by untrained employees is "ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to train. *Bryan Cty.*, 520 U.S., at 409, 117 S. Ct. 1382. Policymakers' "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability." *Id.*, at 407, 117 S. Ct. 1382. Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights

*Connick*, 563 U.S. at 61–62 (citations and quotations mostly omitted).

A showing "of deliberate indifference is difficult, although not impossible, to base on a single incident." *Valle*, 613 F.3d at 549 (citation omitted). "The 'single incident exception' is extremely narrow; a plaintiff must prove that the *highly predictable consequence* of a failure to train would result in the specific injury suffered, and that the failure to train represented the moving force behind the constitutional violation." *Id.* (emphasis in original) (citations and internal quotations omitted). "The single incident exception requires proof of the possibility of recurring situations that present an obvious potential for violation of constitutional rights and the need for additional or different police training." *Id.* (citations omitted). "Indeed, in considering the single-incident exception, '[s]everal panels of [the Fifth Circuit] . . . have reviewed cases where a decision not to train was made long before the alleged violation, and found that the lack of any similar violations indicates that a violation could not be the 'highly predictable consequence' of failing to train." *Id.* at 550 (quoting *Thompson*, 578 F.3d at 299 (citations omitted)). " 'This approach reflects common sense: if there have been thousands of opportunities for municipal employees to violate citizens' constitutional rights, and yet there have been no previous violations,

then the need for training is simply not ' "so obvious." ' " *Id.* (quoting *Thompson*, 578 F.3d at 299–300).

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61 (citation omitted). The Supreme Court advises that the heightened standard of fault and causation for these claims is intended to prevent federal courts from engaging "in an endless exercise of second-guessing municipal employee-training programs. This is an exercise we believe the federal courts are ill suited to undertake, as well as one that would implicate serious questions of federalism." *City of Canton*, 489 U.S. at 392 (internal citations omitted).

### *d.* Analysis

Even if Plaintiff had not waived her failure to train and supervise claims, the Court would find that Plaintiff fails to create a question of fact on them. Plaintiff mentions in briefing how Anderson testified that there is a "strong possibility" that that he or another person in the Maringouin PD or Sheriff's Office arrested someone for defamation. (Anderson Dep. 121, Doc. 102-3.) But, beyond this vague reference, Plaintiff fails to present specific evidence of "a pattern of similar constitutional violations by untrained employees." *Connick*, 563 U.S. at 62. Nor has Plaintiff shown that the "extremely narrow" "single incident exception" applied, as she has not proven that the "the *highly predictable consequence* of a failure to train would result in the specific injury suffered[.]" *Valle*, 613 F.3d at 549. Further, this case is unlike those finding the single incident exception.[11]

---

[11] In *Connick*, the Supreme Court summarized the type of scenario envisioned by this exception:

> In *Canton*, the [Supreme] Court left open the possibility that, "in a narrow range of circumstances," a pattern of similar violations might not be necessary to show deliberate indifference. The Court posed the hypothetical example of a city that arms its police force with firearms and deploys the armed officers into the public

Again, "[d]eliberate indifference is a high standard—'a showing of simple or even heightened negligence will not suffice.' " *Id.* at 542 (quoting *Piotrowski*, 237 F.3d at 579). At worst, Anderson acted negligently with respect to enforcement of the criminal defamation statute and Ventress's complaint. This is insufficient as a matter of law.

Without more, Plaintiff is essentially trying to impose *respondeat superior* on the Town and Anderson, and this is impermissible. Thus, because Plaintiff has failed to demonstrate a

---

> to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force. Given the known frequency with which police attempt to arrest fleeing felons and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights, the Court theorized that a city's decision not to train the officers about constitutional limits on the use of deadly force could reflect the city's deliberate indifference to the "highly predictable consequence," namely, violations of constitutional rights. The Court sought not to foreclose the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations.

*Connick*, 563 U.S. at 63–64, 131 S. Ct. at 1361 (internal citations omitted). Similarly, the Fifth Circuit has discussed its case law on the single incident exception in *Valle*:

> In the one case in which we found a single incident sufficient to support municipal liability, there was an abundance of evidence about the proclivities of the particular officer involved in the use of excessive force. *See Bryan County,* 219 F.3d at 462 (finding deliberate indifference based on the police officer's known "personal record of recklessness and questionable judgment," inexperience, exuberance, and involvement in forcible arrest situations). On the other hand, we have rejected claims of deliberate indifference even where a municipal employer knew of a particular officer's propensities for violence or recklessness. *See, e.g., Davis,* 406 F.3d at 382–85 (finding no deliberate indifference even though city was aware that officer fired weapon inappropriately, had a propensity for violence, and had received citizen complaints about the officer); *Snyder v. Trepagnier,* 142 F.3d 791, 798 (5th Cir. 1998) (rejecting claim of deliberate indifference even though evidence showed officer was extremely stressed, may have had a quick temper, and was aggressive). This court has been wary of finding municipal liability on the basis of a single incident to avoid running afoul of the Supreme Court's consistent rejection of respondeat superior liability. *See, e.g., Pineda,* 291 F.3d at 334–35 (noting that the court rarely finds municipal liability for a failure to train claim on the basis of a single incident).

*Valle*, 613 F.3d at 549.

genuine issue of material fact on the issue of deliberate indifference, any failure to train or supervise claims, if not waived, must be dismissed.

### *6. Summary*

Plaintiff's attempt to impose liability on the Town based on the single decision of Anderson fails as a matter of law. No reasonable juror could conclude that Anderson committed any constitutional violation. Nor is there any question of fact on Plaintiff's failure to train or supervise claims, which have either been waived or fail for insufficient evidence. Consequently, Plaintiff's § 1983 claims against Anderson and the Town must be dismissed.

### **E. Claims Against Anderson in His Individual Capacity**

### *1. Fourth Amendment Claim*

### *a.* Applicable Law on Qualified Immunity

"Qualified immunity protects government officials from civil liability in their individual capacity to the extent that their conduct does not violate clearly established statutory or constitutional rights." *Garcia v. Blevins*, 957 F.3d 596, 600 (5th Cir. 2020), *cert denied*, 141 S. Ct. 1058 (2021) (quoting *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016)). "It shields 'all but the plainly incompetent or those who knowingly violate the law.' " *Id.* (quoting *Thompson v. Mercer*, 762 F.3d 433, 437 (5th Cir. 2014) (quoting *al-Kidd*, 563 U.S. at 743)).

"To rebut [Anderson's] qualified immunity defense, Plaintiff[] must point to summary judgment evidence '(1) that [Anderson] violated a federal statutory or constitutional right and (2) that the unlawfulness of the conduct was 'clearly established at the time.' " *Cloud v. Stone*, 993 F.3d 379, 383 (5th Cir. 2021) (quoting *Rich v. Palko*, 920 F.3d 288, 294 (5th Cir. 2019) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)), *cert. denied*, 140 S. Ct. 388 (2019).

"[The Court] can analyze the prongs in either order or resolve the case on a single prong." *Id.* (quoting *Garcia*, 957 F.3d at 600 (citing *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019))).

Here, in finding that Plaintiff failed to demonstrate a question of fact on the Town's liability, the Court determined that Plaintiff failed to establish a constitutional violation against Anderson.  Consequently, the claims against him in his individual capacity can be dismissed on this basis alone.

However, Plaintiff's claims can also be dismissed on the second prong as well. Plaintiff "bear[s] the burden of showing that the right was clearly established." *Garcia*, 957 F.3d at 600 (citing *Cass*, 814 F.3d at 733). "To be clearly established, a right must be 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.' " *Id.* at 600–01 (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam)). The Court "cannot 'define clearly established law at a high level of generality.' " *Id.* at 601 (quoting *Al-Kidd*, 563 U.S. at 742). "Rather, the question must be 'frame[d] . . . with specificity and granularity.' " *Id.* (quoting *Morrow v. Meachum*, 917 F.3d 870, 874–75 (5th Cir. 2019)).  Courts "do not require plaintiffs to identify a case 'directly on point,' but the case law must "place[ ] the statutory or constitutional question *beyond debate*.' " *Id.* at 600–01 (quoting *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (quoting *al-Kidd*, 563 U.S. at 741)). "Our inquiry 'must be taken in light of the specific context of the case, not as a broad general proposition.' " *Id*. at 601 (quoting *Mullenix*, 136 S. Ct. at 308 (quoting *Brosseau v. Haugen*, 543 U.S. 194)).

The Supreme Court has "stressed that the 'specificity' of the rule is 'especially important in the Fourth Amendment context.' " *Wesby*, 137 S. Ct. at 590 (quoting *Mullenix*, 136 S. Ct. at 308). "Probable cause 'turn[s] on the assessment of probabilities in particular factual contexts' and cannot be 'reduced to a neat set of legal rules.' " *Id.* (quoting *Gates*, 462 U.S. at 232). "It is

'incapable of precise definition or quantification into percentages.' " *Id.* (quoting *Pringle*, 540 U.S., at 371). "Given its imprecise nature, officers will often find it difficult to know how the general standard of probable cause applies in 'the precise situation encountered.' " *Id.* (quoting *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017)). "Thus, we have stressed the need to 'identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment.' " *Id.* (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam) and citing *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014)). Again, "[w]hile there does not have to be 'a case directly on point,' existing precedent must place the lawfulness of the particular arrest 'beyond debate.' " *Id.* (quoting *al–Kidd*, 563 U.S. at 741). "Of course, there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam)). "But 'a body of relevant case law' is usually necessary to ' "clearly establish" the answer' with respect to probable cause." *Id.* (quoting *Brosseau*, 543 U.S. at 199).

In sum, "[w]hen considering a defendant's entitlement to qualified immunity, [the Court] must ask whether the law so clearly and unambiguously prohibited his conduct that '*every reasonable official would understand that what he is doing violates [the law].*' " *McLin*, 866 F.3d at 695–96 (quoting *Morgan*, 659 F.3d at 371 (quoting *al-Kidd*, 563 U.S. at 741) and citing *Lane v. Franks*, 134 S. Ct. 2369, 2381 (2014) (noting that the right must be clearly established "at the time of the challenged conduct")). "To answer that question in the affirmative, we must be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Id.* at 696 (quoting *Morgan*, 659 F.3d at 371–72 (internal quotation marks omitted) (quoting *al-Kidd*, 563 U.S. at 742)); *see also*

*Mullenix*, 136 S. Ct. at 308 ("The dispositive question is whether the violative nature of *particular* conduct is clearly established." (internal citation and quotation omitted)). "Where no controlling authority specifically prohibits a defendant's conduct, and when the federal circuit courts are split on the issue, the law cannot be said to be clearly established." *McLin*, 866 F.3d at 696 (quoting *Morgan*, 659 F.3d at 372).

### b. Analysis

Having carefully considered the matter, the Court finds that Anderson is entitled to qualified immunity. "We start by defining 'the circumstances with which [Anderson] w[as] confronted.'" *Wesby*, 138 S. Ct. at 590–91 (quoting *Anderson*, 483 U.S. at 640). On October 17, 2017, Ventress, Bourgeois, and James spoke personally with Anderson and told him the letter sent by Plaintiff to RJ's which contained statements that were untrue. (*A&D-SUF* ¶ 7, Doc. 102-1.) Each of these individuals prepared voluntary statements. (*See* Anderson Dep. 189, 192, Doc. 102-3; Ventress Dep. 89, Doc. 102-6.) Ventress's statement said in pertinent part that Plaintiff "mail [sic] a letter to my job with false statement about me. She acuse [sic] me of being over gang, harassing her on her job, and follow her [sic] from her job." (*A&D SUF* ¶ 11, Doc. 102-1.) Bourgeois' statement said in part that his "job received a certified letter from [Plaintiff] stating I was the leader of trucking terrorist. About to lose my job for nothing." (*Id.* ¶ 12.) These individuals then signed affidavits, and the Justice of the Peace issued warrants for Plaintiff's arrest based on them. (Exs. 10, 12 to Anderson Dep., Doc. 102-3 at 250, 252; Ex. 1 to Ventress Dep., Doc. 102-6 at 113.)

Thus, even assuming that Anderson himself lacked probable cause for the issuance of the arrest warrant (a fair assumption in light of *Snyder*), as demonstrated above, Anderson is entitled to qualified immunity based on the probable cause deriving from Ventress's statement and the

letter. And, even if there was not probable cause for Plaintiff's arrest, Anderson would still be entitled to qualified immunity because he "reasonably but mistakenly conclude[d] that probable cause [wa]s present." *Wesby*, 138 S. Ct. at 591 (citation omitted).

Plaintiff has the burden of establishing a violation of clearly established law, *Garcia*, 957 F.3d at 600 (citing *Cass*, 814 F.3d at 733), but the single case she cites (*Spencer*) is insufficient. As demonstrated above, *Spencer* did not involve Voluntary Statements made with language tantamount to an oath, and there's no indication that the warrant reflected it was made "upon oath." Even if these Voluntary Statements were insufficient, the Court could not conclude from the cases Plaintiff brings before the Court that "existing precedent . . . place[d] the lawfulness of the particular arrest 'beyond debate.' " *Wesby*, 137 S. Ct. at 590 (quoting *al–Kidd*, 563 U.S. at 741). Plaintiff also fails to demonstrate that this is an "obvious" case of misconduct.

Consequently, the Court finds that the law did not "so clearly and unambiguously prohibit[] [Anderson's] conduct that '*every* reasonable official would understand that what he is doing violates [the law].' " *McLin*, 866 F.3d at 695–96 (quoting *Morgan*, 659 F.3d at 371 (quoting *al-Kidd*, 563 U.S. at 741)). Plaintiff has not pointed to "controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Id.* at 696 (citation omitted). As a result, Anderson is entitled to qualified immunity, and for this additional reason, Plaintiff's Fourth Amendment claim against Anderson will be dismissed.

### 2. First Amendment Claim

#### a. Applicable Law

"[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for

speaking out." *Anderson v. Larpenter*, 2017 WL 3064805, at *13 (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)). "[G]overnment retaliation against a private citizen for exercise of First Amendment rights cannot be objectively reasonable." *Id.* (quoting *Keenan v. Tejeda*, 290 F.3d 252, 261 (5th Cir. 2002) (citing *Rolf v. City of San Antonio*, 77 F.3d 823, 828 (5th Cir. 1996))).

However, as Judge Africk explained in *Anderson v. Larpenter*:

> [C]ourts distinguish between retaliatory action that has an independent lawful basis—*e.g.*, an officer's arrest of a speaker where the officer's motivation for the arrest is retaliation for the speaker's defamatory statements about the officer, but where probable cause exists justifying the arrest—and retaliatory action that has no independent lawful basis. Where "law enforcement officers might have a motive to retaliate but there was also a ground to charge criminal conduct against the citizen they disliked," then "the objectives of law enforcement take primacy over the citizen's right to avoid retaliation." *Id.* at 261-62; *see also Mozzochi v. Borden*, 959 F.2d 1174, 1179 (5th Cir. 1992). On the other hand, "[i]f no reasonable police officer could have believed that probable cause existed for the law enforcement actions of [an officer] against the plaintiff[ ], then their retaliation violated clearly established law in this circuit." [*Keenan*, 290 F.3d at 262.] In other words, [a plaintiff] has a clearly established right to be free from retaliatory action by government officials where "nonretaliatory grounds" are "insufficient" to justify the action. [*Hartman v. Moore*, 547 U.S. 250, 256 (2006)].

*Id.*

b. <u>Analysis</u>

Having carefully considered the matter, the Court finds that Plaintiff has failed to demonstrate that Anderson is not entitled to qualified immunity on her First Amendment claim. As demonstrated above, a reasonable officer in Anderson's position could believe that probable cause existed to arrest Plaintiff for her conduct toward Ventress. Consequently, Plaintiff's First Amendment claim can be dismissed on this ground as well. *Cf. id.* at *13–14 (finding, where there was no independent basis for probable cause from third parties, that sheriff was not entitled to

qualified immunity because "a reasonable law enforcement officer in [his] position would have known that probable cause supporting the search warrant did not exist because [plaintiff's] speech could not constitute a crime").

## IV.  Discussion: Section 1983 Claims Against Davis

### A.  Introduction

In short, all § 1983 claims against Davis will be dismissed.  To the extent Plaintiff makes a false arrest or malicious prosecution claim under § 1983 against Davis, such claims are dismissed on the same basis as her claims against Anderson: probable cause, the independent-intermediary doctrine, and qualified immunity.  While Plaintiff also asserts an excessive force claim against Davis, the Court finds that, even if there were a question of fact as to whether Davis committed a constitutional violation, Davis would be entitled to qualified immunity.

### B.  Parties' Arguments

Davis argues that Plaintiff has failed to establish an excessive force claim against him. (Doc. 102-2 at 14.)  The evidence shows that Plaintiff "had no scars, bruises or cuts as a result of being handcuffed," and, though she complained of being handcuffed behind her back, Davis re-cuffed her after she asked him to do so. (*Id.*)  The only force complained of was placing Plaintiff in handcuffs. (*Id.* at 15.)  Such discomfort is not enough, by itself, to constitute excessive force.

Plaintiff responds that Davis has no claim to qualified immunity because the standard for excessive force cases was well established at the time of the events of this suit. (Doc. 107 at 8.) Here, there is no indication that Payton was a threat to anyone or attempted to flee, but, despite this, Davis tightened her handcuffs and kept her that way for hours, even after she was placed in jail. (*Id.* at 9.)  Further, after Payton was handcuffed, Davis recuffed her multiple times tightly, once for thirty miles in the car with her hands behind her back. (*Id.*)  While in her jail cell, Plaintiff

eventually asked to be handcuffed in the front after being in them with her arthritis for two hours. (*Id.*) Thus, Plaintiff suffered a legally cognizable injury. (*Id.* at 10.) The injury must be more than *de minimis*, but it need not be significant or serious. (*Id.* (citation omitted).) Moreover, the key is the context in which the force is used and the injury arises. (*Id.* (citation omitted).) Because Plaintiff was a woman with arthritis who was charged with a nonviolent crime, the force was unjustified. (*Id.*) Additionally, Plaintiff urges that psychological injury is sufficient, and, here, she suffered that as well. (*Id.* at 11.)

Davis replies that "[t]here is nothing in the record that establishes [Plaintiff] sustained any injury that resulted directly and only from the use of force that was clearly excessive and unreasonable." (Doc. 109 at 8 (citing *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016)).) The only force used against Plaintiff was placing her in handcuffs, and there is no evidence that force was used during or before the arrest. (*Id.* at 8–9.) Moreover, Plaintiff allegedly suffered only minor injuries in connection with placing her in handcuffs, and Davis urges that the Fifth Circuit has held that this is insufficient. (*Id.* at 9 (citing *Freeman v. Gore*, 483 F.3d 404, 417 (5th Cir. 2007)).) Lastly, there is no evidence that Plaintiff's psychological injuries arose directly and only from the alleged use of force. (*Id.*)

### C. Applicable Law

"To prevail on an excessive force claim, a plaintiff must establish: '(1) injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.' " *Freeman v. Gore*, 483 F.3d 404, 416 (5th Cir. 2007) (Dennis, J.) (quoting *Tarver v. City of Edna*, 410 F.3d 745, 751 (5th Cir. 2005)). "Excessive force claims are necessarily fact-intensive; whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.' " *Deville v. Marcantel*, 567 F.3d 156, 167

(5th Cir. 2009) (quoting *Graham v. Connor*, 490 U.S. 386, 396, (1989), and citing *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004) (observing that this "area is one in which the result depends very much on the facts of each case")). "Factors to consider include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.' " *Id.* (quoting *Graham*, 490 U.S. at 396). "This list is not exclusive, however, and the Court may examine the totality of the circumstances." *Drumgole v. Frumveller*, No. 14-2827, 2015 WL 2250134, at *8 (E.D. La. May 13, 2015).[12]

As to the first prong, "the plaintiff's asserted injury must be more than *de minimis*." *Freeman*, 483 F.3d at 416 (citing *Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001). "The determination of whether a plaintiff's alleged injury is sufficient to support an excessive force claim is context-dependent and is 'directly related to the amount of force that is constitutionally permissible under the circumstances.' " *Id.* at 416–17 (quoting *Ikerd v. Blair*, 101 F.3d 430, 435 (5th Cir. 1996) and citing *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999) ("In determining whether an injury caused by excessive force is more than de minimis, we look to the context in which that force was deployed.")). "Although a showing of 'significant injury' is no longer required in the context of an excessive force claim, [the Fifth Circuit] do[es] require a plaintiff asserting an excessive force claim to have 'suffered at least some form of injury.' " *Glenn*, 242 F.3d at 314 (quoting *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999)); *see also Keele v. Leyva*, 69 F. App'x 659, 2003 WL 21356063, at *1 (5th Cir. 2003) (unpublished) (per curiam) ("The injury must be more than a *de minimis* physical injury, but need not be significant or

---

[12] That said, an "excessive force claim is separate and distinct from [an] unlawful arrest claim, and [the Court] must therefore analyze the excessive force claim without regard to whether the arrest itself was justified." *Freeman*, 483 F.3d at 417 (citations omitted).

serious." (citing *Gomez v. Chandler*, 163 F.3d 921, 924 (5th Cir. 1999)). Elaborating on this, the

Fifth Circuit said recently:

> "[A]lthough a *de minimis* injury is not cognizable, the extent of injury necessary to satisfy the 'injury requirement is 'directly related to the amount of force that is constitutionally permissible under the circumstances.' " *Brown v. Lynch*, 524 Fed. Appx. 69, 79 (5th Cir. 2013) (quoting *Ikerd v. Blair*, 101 F.3d 430, 434–35 (5th Cir. 1996)). "*Any* force found to be objectively unreasonable necessarily exceeds the *de minimis* threshold, and, conversely, objectively reasonable force will result in *de minimis* injuries only." *Id.* (emphasis added) (footnote omitted). Consequently, "only one inquiry is required to determine whether an officer used excessive force in violation of the Fourth Amendment." *Ikerd*, 101 F.3d at 434 n.9. In short, "as long as a plaintiff has suffered 'some injury,' even relatively insignificant injuries and purely psychological injuries will prove cognizable when resulting from an officer's unreasonably excessive force." *Brown*, 524 Fed. Appx. at 79 (footnotes omitted) (quoting *Ikerd*, 101 F.3d at 434).

*Alexander v. City of Round Rock*, 854 F.3d 298, 309 (5th Cir. 2017).

Turning to the specific use of force here, the Fifth Circuit has held "minor, incidental

injuries that occur in connection with the use of handcuffs to effectuate an arrest do not give rise

to a constitutional claim for excessive force." *Freeman*, 483 F.3d at 417 (citing *Glenn*, 242 F.3d

at 314 (stating that "handcuffing too tightly, without more, does not amount to excessive force");

*see also Tarver*, 410 F.3d at 751–52 (quoting *Glenn*)). "To prevail on an excessive force claim

related to the use of handcuffs, a plaintiff must suffer injuries beyond those that result from the

typical force needed to complete the arrest." *Juarez v. Pizana*, No. 17-368, 2018 WL 7198152, at

*7 (W.D. Tex. Dec. 12, 2018) (citing *Deville*, 567 F.3d at 168).

Several cases illustrate these principles. Some support Plaintiff, and others support Davis.

Plaintiff relies on the unpublished Fifth Circuit decision of *Keele v. Leyva* to bolster her

claim. There, plaintiff alleged excessive force against a bailiff who was in charge of transporting

him from the courthouse to the detention center. *Keele*, 2003 WL 21356063 at *1. Plaintiff alleged

that he told the bailiff he had a sore shoulder, and the bailiff then "exert[ed] excessive force in securing his handcuffs behind his back." *Id.* "In response to [plaintiff's] cursing that [the bailiff] would break his arm, [the bailiff] berated [plaintiff] that if he did not like being handcuffed then he should not come to jail." *Id.* Plaintiff "sought medical treatment after the incident and was treated for an over-rotated shoulder." *Id.* The bailiff argued that the district court erred in denying his motion for summary judgment, but the Fifth Circuit affirmed:

> As the magistrate judge in this case correctly recognized, the mere handcuffing of [plaintiff] did not raise a constitutional claim. *See Williams v. Bramer*, 180 F.3d 699, 704, *clarified*, 186 F .3d 633, 634 (5th Cir.1999). However, once [plaintiff] alerted [the bailiff] to his shoulder condition, the continued exertion of force in securing the restraint rose to the level of malice. *See id.* at 704. Because [plaintiff] has stated a cognizable claim of excessive force, the district court did not err in denying [the bailiff's] motion for summary judgment.

*Id.* at *2.

Plaintiff also points to *United States v. Diaz*, 498 F. App'x 407 (5th Cir. 2012) (unpublished). In this criminal case, the victim was lying face down on the ground with his hands handcuffed behind his back. *Id.* at 409. The Government presented evidence that the defendant officer "placed his knee on [the victim's] back, grabbed the chain of his handcuffs, and pushed [the victim's] arms toward his head up a 90-degree angle, causing [the victim] to cry out in pain as [the defendant] asked about the marijuana." *Id.* at 409–10. Defendant then swept the victim's legs from under him, bringing the victim to the ground, after which time defendant kicked the victim. *Id.* at 410. Defendant was charged with, *inter alia*, one count of depriving another person of his civil rights thereby causing "bodily injury" under 18 U.S.C. § 242. *Id.* Defendant was convicted of this and the other counts. *Id.*

On appeal, defendant argued, among other things, that the jury charge on " 'bodily injury' was improper because including 'physical pain' in the definition meant including injuries that this

circuit had held to be *de minimis*." *Id.* at 411. After establishing that, for a conviction under § 242,

the government had to prove a willful deprivation of federal rights under color of law and after

laying out the elements for an excessive force claim (which mirror those in this § 1983 claim), the

Fifth Circuit explained:

> To satisfy the injury requirement, "it is not necessary for the jury to find that the victim suffered 'significant injury,' " [*United States v. Brugman*, 364 F.3d 613, 618 (5th Cir. 2004)] (citation omitted), but the government must show that the victim suffered "some" injury beyond "*de minimis* " injury. *Id.* (citation omitted). To determine whether a Fourth Amendment injury is more than *de minimis*, a court must:
>
> > look to the context in which that force was deployed[ ] . . . [as] related to the amount of force that is constitutionally permissible under the circumstances. What constitutes an injury in an excessive force claim is therefore subjective—it is defined entirely by the context in which the injury arises.
>
> *Brugman*, 364 F.3d at 618 (internal quotation marks and citation omitted). Determining whether the district court abused its discretion by charging the jury that § 242's bodily injury requirement could be satisfied by a finding of physical pain involves a context-sensitive and fact-specific analysis.

*Id.* The Court then turned to *Brugman*:

> In *Brugman*, the defendant willfully kicked and struck Miguel Jimenez–Saldana, who was in a group of approximately ten individuals caught attempting to enter the United States illegally, even though Jimenez–Saldana was, at the time, no longer fleeing or actively resisting the authority of the CBP officers present. *Id.* at 614, 619. Although there was no visible manifestation of injury, Jimenez–Saldana testified that upon being kicked, he felt pain and lost his breath, and that he felt residual pain for approximately three days following the incident. *Id.* at 619. Additionally, a CPB officer testified that he heard Jimenez–Saldana emit a "grunting noise" while being kicked and struck. *Id.* We reasoned that this was sufficient to clear the *de minimis* threshold even though there was no visible manifestation of injury. *Id.*

*Id.* at 412. After analyzing *Brugman*, the Fifth Circuit concluded, " 'physical pain' may, depending on the context in which the injury arose, constitute 'bodily injury' sufficient to overcome the *de minimis* threshold. Accordingly, we cannot say that the district court abused its discretion in its charge to the jury." *Id.*

The *Diaz* court also rejected defendant's argument that there was insufficient evidence to convict him. The Fifth Circuit explained:

> Viewing all of the evidence in the light most favorable to [defendant], [the victim] suffered the following injuries: while on his stomach with his hands handcuffed behind him, his arms were raised up and were then lowered back down causing him pain; he had a knee placed on his back which caused him pain; he was kicked "soccer style"; and, though there was no bone or ligament damage or bruising, [the victim's] shoulder was sore for "one or two days." Under this circuit's precedent, [defendant] maintains these injuries do not pass the *de minimis* threshold and, thus, cannot form a conviction under § 242.
>
> As previously discussed, to establish a constitutional violation predicated on an excessive use of force, the victim must have suffered "some injury" which is more than *de minimis. Brugman,* 364 F.3d at 618. Determining what constitutes "some injury" is highly fact-specific and dependant on the circumstances of the individual case. *See id.; see also United States v. Harris,* 293 F.3d 863, 871 (5th Cir. 2002) (suggesting that "bodily injury would include a cut or bruise or physical pain"). Here, the record is not devoid of evidence in support of the jury's finding that [defendant] conduct resulted in "bodily injury," which, under the circumstances here, is satisfied by a mere showing of physical pain. There was no plain error.

*Id.* at 412–13.

Additionally, another relevant case not relied upon by Plaintiff was *Deville*, where the Fifth Circuit found excessive force when an officer applied handcuffs too tightly. 567 F.3d at 168. The appellate court explained that Plaintiff had "provided evidence that the handcuffs were applied so tightly as to cause long-term nerve damage that was severe enough to require four surgeries." *Id.*

at 168  The circuit court found, "These injuries are not *de minimis*." *Id.* at 168–69 (citing *Tarver*,

410 F.3d at 751–52).  The Fifth Circuit also found that the officers were not entitled to qualified

immunity because:

> Accepting Deville's version of events for summary judgment purposes, this case involved: a traffic stop for a minor traffic offense unsupported by probable cause; Deville's passive resistance to being removed from her car and separated from her grandchild, in compliance with her well-established rights under state law to resist an unlawful arrest (*i.e.*, an arrest unsupported by probable cause); the officer's threat of calling child protective services despite no indication that the child was in distress or that Deville intended to flee; an officer who others said smelled of alcohol beating on Deville's driver's window with a heavy flashlight and breaking the window; a rough extraction of Deville from the vehicle by both officers, causing a forceful blow to Deville's abdomen; and handcuffs applied so tightly that they caused severe nerve damage.

*Id.* at 169. The Fifth Circuit found that the "alleged facts [were] sufficiently egregious to warrant

a denial of qualified immunity because a reasonable officer would have known that the degree of

force was unconstitutionally excessive under the circumstances." *Id.* (citation omitted).

Other cases, however, reach a different result.  For example, in *Freeman*, "the most

substantial injury claimed by Freeman [was] that she suffered bruising on her wrists and arms

because the handcuffs were applied too tightly when she was arrested." *Freeman*, 483 F.3d at 417.

Additionally, the plaintiff complained that the deputies left her in the patrol car for 30 to 45

minutes. *Id.*  Now Judge Dennis, writing for the majority, found that the district court erred in

denying the officer's motion for summary judgment on the excessive force claim. *Id.*

Likewise, in *Tarver*, Plaintiff alleged that "he suffered 'acute contusions of the wrist,' and

psychological injury from being handcuffed." 410 F.3d at 751.  The Fifth Circuit found that the

officers were entitled to qualified immunity. *Id.* at 754.  Plaintiff did not argue that the officers

acted maliciously or purposely used the handcuffs to cause harm to Plaintiff. *Id.* at 751.  Further:

Although we no longer require "significant injury" for excessive force claims, *id.,* the injury must be more than *de minimis. Williams v. Bramer,* 180 F.3d 699, 703 (5th Cir. 1999). In *Glenn v. City of Tyler*, we held that "handcuffing too tightly, without more, does not amount to excessive force." 242 F.3d 307, 314 (5th Cir. 2001); *accord Crumley v. City of St. Paul,* 324 F.3d 1003, 1008 (8th Cir. 2003) (reaffirming a prior holding requiring medical records establishing permanent injury before allowing the application of handcuffs to give rise to an excessive force claim). As Tarver does not allege any degree of physical harm greater than *de minimis* from the handcuffing, we find that he has not satisfied the injury requirement of a § 1983 claim.

Tarver's claim of psychological injury also fails. Although psychological injuries can serve as a basis for § 1983 liability, *Flores v. City of Palacios,* 381 F.3d 391, 400–01 (5th Cir. 2004), Tarver does not demonstrate that he suffered psychological injury from the handcuffing or that the handcuffing was excessive or unreasonable.

*Id.* at 752.

Similarly, in *Lockett v. New Orleans City*, 607 F.3d 992 (5th Cir. 2010), plaintiff complained of excessive force from being handcuffed too tightly. *Id.* at 999. Plaintiff acknowledged that he did not complain about the pain while handcuffed, and there was no evidence from the jail medical intake forms that he complained of pain. *Id.* But, after he was released from jail, plaintiff and his wife complained to someone with the Louisiana National Guard that the handcuffs had hurt his wrists. *Id.* Moreover, several days later, plaintiff "visited a physician, complaining of pain in his wrists," though, at the deposition, he stated he was not currently under any care for his wrist injury. *Id.* The Fifth Circuit found that the "defendants were properly accorded qualified immunity with respect to the claim of excessive force," explaining:

Lockett's claim boils down to an allegation that the handcuffs were too tight. Such a claim, without more, does not constitute excessive force: "This court finds that handcuffing too tightly, without more, does not amount to excessive force." *Glenn*, 242 F.3d at 314; accord *Freeman v. Gore*, 483 F.3d 404, 417 (5th Cir. 2007) (rejecting as *de minimis* the plaintiff's claim "that the deputies twisted her arms

behind her back while handcuffing her, 'jerked her all over the carport,' and applied the handcuffs too tightly, causing bruises and marks on her wrists and arms.").

*Id.* at 999–1000.

Finally, in *Juarez v. Pizana*, plaintiff suggested that defendant acted maliciously in handcuffing her. *Juarez v. Pizana*, No. 17-368, 2018 WL 3846039, at *6 (W.D. Tex. June 29, 2018). "Plaintiff alleges that Defendant refused to remove the handcuffs after being notified that they were hurting Plaintiff's shoulder, that she put Plaintiff in a cell without removing them, and that, at some point subsequent, she told Plaintiff that she 'could do whatever she wanted.' " *Id.* Despite these allegations, the district court found that plaintiff failed to state a cognizable claim:

> Still, it is far from clear how long Plaintiff remained handcuffed once she was placed in the cell, or whether Defendant's taunt was related to her refusal to remove the handcuffs. Moreover, Plaintiff does not allege that she was treated "in a manner objectively outside the scope of handcuffing in the ordinary course of an arrest." *Daniel v. City of Minden*, No. 12-CV-2171, 2015 WL 9684959, at *5 (W.D. La. Nov. 17, 2015). Therefore, because the allegations suggest that her handcuffing claim is premised on bruising and because her contentions only vaguely indicate anything outside the scope of the ordinary, Plaintiff has not alleged a cognizable injury. *See Freeman*, 483 F.3d at 417; *see also Tarver v. City of Edna*, 410 F.3d 745, 751 (5th Cir. 2005) (finding that "acute contusions of the wrist" are a *de minimis* injury).

*Id.* at *9.

As to the second part of the qualified immunity analysis, "[i]n excessive-force cases, 'police officers are entitled to qualified immunity unless existing precedent *squarely governs* the specific facts at issue.' " *Garcia*, 957 F.3d at 601 (quoting *Morrow*, 917 F.3d at 876 (emphasis added by *Garcia*) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam)). Additionally, unpublished opinions "cannot clearly establish the law." *Id.*

## D. Analysis

Having carefully considered the matter, the Court finds that Davis is entitled to qualified immunity for the excessive force claim arising from Plaintiff's October 17, 2017, arrest. On the night in question, Davis executed a "fugitive" warrant, "placed [Plaintiff] under arrest, handcuffed (DBL) [her], verbally Mirandized [her], and transported [her] to West Baton Rouge Parish Jail for booking." (Anderson Dep. 195–198, Doc. 102-3; Ex. 14 to Anderson Dep., Doc. 102-3 at 254–58.) It is undisputed that Plaintiff had no scars, bruises, or cuts as a result of being handcuffed. (*A&D SUF* ¶ 17, Doc. 102-1.) It is also undisputed she was originally handcuffed behind her back, but, when she requested him to do so, Davis re-handcuffed her in front. (*Id.* ¶ 18.) Finally, there's no question that, before May of 2020, Plaintiff saw a doctor only once for any condition she believed related to the arrest and that, after May of 2020, she was seen in May and June of 2020 only for stress and anxiety. (*Id.* ¶¶ 19–20.)

Plaintiff, on the other hand, highlights the fact that Davis cuffed her "very tightly" (*Payton Decl.* ¶ 4, Doc. 106-2), that she immediately felt pain in her wrists and hands (*id.*), that she felt "completely humiliated" at the time of the arrest when Davis "paraded [her] before a group of townspeople who had gathered across the street to watch and to record the scene with their cell phone cameras" (*id.* ¶ 5–6), that she was handcuffed for a 30-mile ride "with the cuffs pinching [her] wrists as [her] hands were once again sandwiched between [her] body and the seat," (*id.* ¶ 8), how nobody else was brought in with their handcuffs behind their back (*id.* ¶ 11), that she then asked Davis if she could be re-cuffed—which he did—(*id.* ¶ 12), and how by this time she had spent two hours with her hands cuffed behind her back, (*id.* ¶ 13). Plaintiff also urges that her offense was a non-violent crime and that she was not a flight risk.

While there may be a question of fact as to whether Plaintiff's version of events constitutes a constitutional violation, the Court cannot find that "the law so clearly and unambiguously prohibited [Davis's] conduct that '*every* reasonable official would understand that what he is doing violates [the law].' " *McLin*, 866 F.3d at 695–96. As stated above, with an excessive force case, Plaintiff has the burden of showing that "existing precedent *squarely governs* the specific facts at issue." *Garcia*, 957 F.3d at 601 (citation omitted). Here, Plaintiff fails to meet her burden. Plaintiff's most factually analogous cases involving handcuffs—*Diaz* and *Keele*—are both unreported decisions, and, as *Garcia* recognizes, unreported decisions "cannot clearly establish the law." *Id.*

Even putting that aside, this case is easily distinguishable from those cases discussed above where courts found liability. Unlike *Keele*, Davis did not continue the use of force after Plaintiff informed him of her pain. *Keele*, 2003 WL 21356063, at *1. To the contrary, again, it is undisputed that when Plaintiff requested Davis to do so, he re-handcuffed her in the front. (*A&D SUF* ¶ 18, Doc. 102-1.) Further, unlike *Diaz*, there was no pushing of Plaintiff's arms to a 90-degree angle, no sweeping Plaintiff's legs from under her, and no giving her a "soccer-style" kick. *Diaz*, 498 F. App'x at 410, 412–13. Thus, the use of force in this case is far less than that in *Diaz*. Similarly, unlike *Brugman*, Plaintiff was not kicked or struck. *See id.* at 412. And unlike *Deville*, Plaintiff did not have her "handcuffs applied so tightly that they caused severe nerve damage." *Deville*, 567 F.3d at 169.

Rather, this case is much closer to those finding no liability for handcuffing. Like *Freeman*, Plaintiff primarily complains that the cuffs were too tight and that she spent too much time in the patrol car. *Freeman*, 483 F.3d at 417. In *Freeman*, being handcuffed 30 to 45 minutes in the patrol car was not excessive, and Plaintiff has pointed to no case demonstrating that it was clearly

established such that all reasonable officers would know beyond debate that the amount of time Plaintiff spent handcuffed was excessive. Additionally, like *Tarver*, Plaintiff "does not allege any degree of physical harm greater than *de minimis* from the handcuffing," and any claim for psychological injury fails because Plaintiff "does not demonstrate that [s]he suffered psychological injury from the handcuffing or that the handcuffing was excessive or unreasonable." *Tarver*, 410 F.3d at 752. Finally, in *Juarez*, plaintiff alleged that the defendant refused to remove the handcuffs after complaint and that she was put in a cell without removing them, yet the court still found that Plaintiff's "contentions only vaguely indicate anything outside the scope of the ordinary" and therefore "[p]laintiff ha[d] not alleged a cognizable injury." 2018 WL 3846039, at *6.

Though Plaintiff's claim appears to "boil[] down to an allegation that the handcuffs were too tight," which, "without more, does not constitute excessive force," *Lockett*, 607 F.3d at 999, that is not the key issue. The question here is not whether Plaintiff established a constitutional violation. Rather, for the second part of the qualified immunity analysis, Plaintiff had to show that " 'existing precedent *squarely governs* the specific facts at issue.' " *Garcia*, 957 F.3d at 601 (citation omitted). Given *Freeman*, *Tarver*, *Lockett,* and *Juarez*, a reasonable officer in Davis's situation could believe his conduct was lawful. At the very least, the Court cannot say that "case law . . . placed the statutory or constitutional question *beyond debate*." *Garcia*, 957 F.3d at 600–01 (cleaned up). Consequently, the Court will grant summary judgment to Davis on the § 1983 excessive force claim on the basis of qualified immunity.

## V.     Discussion: Section 1983 Conspiracy Claim

### A.  Parties' Arguments

The Town argues that Plaintiff fails to state a conspiracy claim. (Doc. 100-1 at 8–9.) Maringouin asserts that the allegations of an agreement are wholly conclusory and insufficient under federal law. (*Id.*)

Plaintiff does not respond to the Town on this issue in her opposition to that motion, but she argues in her response to the *RJ's MSJ* that there was a § 1983 conspiracy. (Doc. 108 at 9–10.) Plaintiff asserts, "Ventress'[s] testimony establishes numerous facts from which the jury can conclude that he conspired with the other Defendants – including Anderson and Simpson – to have Payton falsely arrested, unlawfully seized, and maliciously prosecuted." (*Id.* at 9.)  Plaintiff then describes how Anderson talked with the three truck drivers, how they met at the police station, how Anderson had each fill out the Voluntary Statements, and how the warrants were based on the affidavits they completed. (*Id.* at 10.) "Thus, Ventress'[s] testimony establishes that there was an agreement among the Defendants and Simpson to do something about Payton's speech – what they deemed harassment." (*Id.*)

RJ's and Ventress reply that Plaintiff's claims against them "stem from Ventress'[s] legitimate exercise of a legal right – i.e. reporting Plaintiff's defamatory conduct.  For this reason, Plaintiff's conspiracy claims against the RJ's Defendants fail.  There is no evidence of any agreement to commit an *illegal act*." (Doc. 111 at 5 (emphasis in original).)  These defendants then argue that "Plaintiff resorts to cherry-picking and distorting Ventress'[s] deposition testimony to suggest the appearance of some impropriety by the fact that Ventress talked to his friends and neighbors every day and was tired of being videoed by Plaintiff." (*Id.*)  But, "Ventress never states

they formed any kind of agreement relative to Plaintiff." (*Id.*) In any event, "*all actions by the RJ's Defendants were perfectly legal*." (*Id.* (emphasis in original).)

## B. Applicable Law

Section 1983 conspiracy "claims are unique. The plaintiff must not only [demonstrate] facts that 'establish (1) the existence of a conspiracy involving state action,' but also '(2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy.' " *Shaw v. Villanueva*, 918 F.3d 414, 419 (5th Cir. 2019) (quoting *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1187 (5th Cir. 1990), *abrogated on other grounds by Martin v. Thomas*, 973 F.2d 449 (5th Cir. 1992)).

As to the first element, "[t]o establish a cause of action based on conspiracy[,] a plaintiff must show that the defendants agreed to commit an illegal act." *Arsenaux v. Roberts*, 726 F.2d 1022, 1024 (5th Cir. 1982) (Rubin, J.). "[M]ore than a blanket of accusation is necessary to support a § 1983 claim." *Id.* (citations omitted). Plaintiffs must make "specific allegation[s] of fact[] tending to show a prior agreement has been made." *Id.* at 1023–24.

Thus, for instance, in *Jabary v. City of Allen*, 547 F. App'x 600 (5th Cir. 2013), the plaintiff failed to sufficiently state a claim for a § 1983 conspiracy when he alleged "that local officials 'held private meetings to devise a method of shutting down [plaintiff's business]'[;] that they 'actively conspired' with each other to 'destroy [Plaintiff's] civil rights[;]' " and that "there were 'several conversations, private meetings, and other communications' that took place to further their conspiracy to 'deprive [Plaintiff] of his civil rights and the due process of the law.' " *Id.* at 611. The Fifth Circuit held:

> Such statements are conclusory in nature. Without more background facts, [Plaintiff] is unable to demonstrate the existence of the local officials' alleged agreement to the level of plausibility necessary to pass scrutiny under Rule 12(b)(6). The times, places, and other

circumstances of the "private meetings" and secret conversations are notably absent. [Plaintiff] simply fails to create a reasonable inference that such an agreement existed.

*Id.* at 611.

As the second element, again, Plaintiff must show "a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy." *Shaw*, 918 F.3d at 419. "No deprivation, no § 1983 conspiracy." *Id.* Thus, in *Shaw*, the Fifth Circuit reversed the denial of a motion to dismiss because there were no well-pled allegations that the defendants "deprived [plaintiff] of his civil rights[.]" *Id.*

## C. Analysis

Having carefully considered the matter, the Court finds that Plaintiff fails to establish a question of fact with respect to her § 1983 conspiracy claim against any of the moving defendants. In short, Plaintiff has not established a constitutional violation by any member of the alleged conspiracy.

Plaintiff argues in opposing *RJ's MSJ* that the "Defendants" were engaged in a conspiracy. (Doc. 108 at 9–10), but Plaintiff fails to identify competent summary judgment evidence demonstrating a question of fact that *Davis* was a part of this purported agreement. The only testimony about him to which Plaintiff cites was that Ventress told Davis about Ventress's Complaint. (Ventress Dep. 77, Doc. 102-6.) But that sole bit of evidence does not mean Davis formed a conspiracy with the others. Plaintiff must demonstrate "facts [which,] when 'placed in a context . . . [raise] a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.' " *See Jabary*, 648 F. App'x at 610 (said in the Rule 12(b)(6) context) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). Here, Plaintiff shows, at best, only parallel conduct, and her claim of a conspiracy is conclusory and unsupported. No

reasonable juror could find otherwise. Thus, even if Plaintiff showed a constitutional violation as to Davis (which, again, is questionable), that violation cannot serve as a basis for the alleged conspiracy involving Anderson, Ventress, Bourgeois, and James.

Nevertheless, Plaintiff's § 1983 conspiracy claims against these other defendants fail for two reasons. First, to RJ's and Ventress's point, "[t]o establish a cause of action based on conspiracy[,] a plaintiff must show that the defendants *agreed to commit an illegal act*." *Arsenaux*, 726 F.2d at 1024 (emphasis added). But this Court has already determined that no reasonable juror could find that arresting Plaintiff was "an illegal act." Second, under *Shaw*, "[n]o deprivation, no § 1983 conspiracy." *Shaw*, 918 F.3d at 419. As amply demonstrated above, here, there is no constitutional violation by Anderson.

For all these reasons, Plaintiff has demonstrated no genuine issue of material fact against any member of the alleged conspiracy. Consequently, Plaintiff's § 1983 conspiracy claims against these defendants will be dismissed.

## VI. Discussion: Section 1983 Claims Against the RJ's and Ventress

RJ's and Ventress moved for summary judgment as to all claims against them. (Doc. 103.) However, the only federal claims asserted against them appear to be the § 1983 conspiracy claim that this Court dismissed above. Further, to the extent any federal malicious prosecution or false arrest claim is made against these Defendants, it would fail, *inter alia*, because there was no malicious prosecution or false arrest, as detailed above.

## VII. Discussion: Constitutionality of Defamation Law

Plaintiff alleges in her *Amended Complaint* that the Court "should declare Louisiana's criminal defamation law unconstitutional in all situations and enjoin defendants from further enforcing or using the law." (*Am. Compl.* ¶ 124, Doc. 16.) Plaintiff describes these statutes as

overbroad, "unconstitutional on their face," and in violation of the First Amendment. (*Id.* ¶¶ 125–127.) "Payton additionally prays for a declaration that La. R.S. 14:47, 48, and 49, are unconstitutional on their face and for an injunction against their further enforcement or use by defendants." (*Id.* at 24–25.)

Any such claim, however, must be dismissed for two reasons. First, these defendants are not the proper parties against which to facially challenge the constitutionality of a state criminal law. Rather, any such challenge must be made against the district attorney or governor. *See Fox v. Reed*, No. 99-3094, 2000 WL 288379, at *5–6 (E.D. La. Mar. 16, 2000) (finding, where plaintiff brought facial challenge to state criminal law, that attorney general must be dismissed because the district attorney had authority under the Louisiana constitution over prosecutions and enforcement of such statutes).[13]

Second, Plaintiff's facial challenge has been waived by her failing to include it in the pretrial order. "Federal Rule of Civil Procedure 16 authorizes the district court to control and expedite discovery through pretrial orders." *Martin v. Lee*, 378 F. App'x 393, 395 (5th Cir. 2010) (per curiam). "It is a well-settled rule that a joint pretrial order signed by both parties supersedes all pleadings and governs the issues and evidence to be presented at trial." *Id.* (quoting *Elvis Presley Enters., Inc. v. Capece,* 141 F.3d 188, 206 (5th Cir. 1998) (quoting *Branch–Hines v. Hebert,* 939 F.2d 1311, 1319 (5th Cir. 1991))). "Claims, issues, and evidence are narrowed by the pretrial order, thereby focusing and expediting the trial." *Id.* (citing *Elvis,* 141 F.3d at 206 (claims

---

[13] Additionally, the Court notes that Plaintiff failed to file the appropriate notice in the record as required by Federal Rule of Civil Procedure 5.1 identifying the constitutional question and the paper that raises it. Fed. R. Civ. P. 5.1(a)(1)(B). Plaintiff also failed to serve that notice and the paper on the state attorney general. *Id.* 5.1(a)(2). The Court was also required under 28 U.S.C. § 2403 to "certify to the appropriate attorney general that a statute has been questioned," *Id.* 5.1(b), and the attorney general must be given an opportunity to intervene, *Id.* 5.1(c). While "[a] party's failure to file and serve the notice, or the court's failure to certify, does not forfeit a constitutional claim or defense that is otherwise timely asserted," *Id.* 5.1(d), no final judgment can be entered holding the statute unconstitutional until the attorney general is given a chance to intervene, *Id.* 5.1(c). However, the Court can reject the constitutional challenge before the time to intervene expires. *Id.* 5.1(c).

not preserved in a joint pretrial order were waived); *Branch–Hines,* 939 F.2d at 1319 (the pretrial order asserted the plaintiff's full range of damages)). "If a claim or issue is omitted from the final pretrial order, it may be waived, even if it appeared in the complaint." *Id.* (citing *Elvis,* 141 F.3d at 206). "In addition, our court gives the trial court broad discretion to preserve the integrity and purpose of the pretrial order," so, "unless the trial court's ruling in the enforcement of a pretrial order was a clear abuse of discretion that would deem the action arbitrary, the ruling will not be disturbed on appeal." *Id.* (citing and quoting *Geiserman v. MacDonald,* 893 F.2d 787, 790–791 (5th Cir. 1990); (quoting *Hodges v. United States,* 597 F.2d 1014, 1017–18 (5th Cir. 1979)) (internal quotes omitted).

Here, in the pretrial order, Plaintiff states that Davis arrested her "[n]otwithstanding the invalidity of the [defamation] statute," but Plaintiff goes on to say, "She seeks to recover those damages, as well as punitive damages, attorney's fees, and costs, in this suit brought under 42 U.S.C. § 1983 and Louisiana state law." (Doc. 116 at 3.) Plaintiff does not pray that the criminal defamation statute be declared unconstitutional on its face. Given that "[d]istrict courts are encouraged to construe pretrial orders narrowly without fear of reversal," *Martin*, 378 F. App'x at 395 (citing *Flannery v. Carroll*, 676 F.2d 126, 129–130 (5th Cir. 1982) (the district court did not abuse its discretion where it narrowly construed the pretrial order to exclude certain claims, despite slight reference to those claims in the order)), the Court finds that Plaintiff waived her facial challenge to La. Rev. Stat. Ann. § 14:47, 48, and 49.

## VIII. Discussion: Section 1983 Claims Against Bourgeois and James

Neither Bourgeois nor James have moved for summary judgment. However, the federal claims against them appear to fail as a matter of law for the same reasons that such claims against Ventress and RJ's fail.

Federal Rule of Civil Procedure 56(f)(1) provides that the Court may grant summary judgment for a nonmovant "[a]fter giving notice and a reasonable opportunity to respond[.]" Fed. R. Civ. P. 56(f). Accordingly, the Court will hereby give Plaintiff fourteen (14) days to address why the federal claims against Bourgeois and James should not be dismissed for the same reasons detailed above. Any defendant will have seven (7) days thereafter to respond. If the Court dismisses the federal claims against Bourgeois and James, the Court will likely decline to exercise supplemental jurisdiction over all remaining state law claims. *See Conway v. Louisiana Through DPS&C*, No. 18-33, 2021 WL 357357 (M.D. La. Feb. 2, 2021) (deGravelles, J.) (declining *sua sponte* to exercise supplemental jurisdiction over state law claims after all federal claims had been dismissed).

The Court specifically notes that it is *not* inviting a motion for reconsideration from Plaintiff. Her arguments should be limited to explaining why Bourgeois and James's claims should not be dismissed based on the analysis in this opinion. No party should re-urge arguments which have already been rejected or which should have been raised prior to the Court's decision. This matter has been thoroughly briefed in three defense motions for summary judgment, and the Court is familiar with the record.

## IX. Conclusion

Accordingly,

**IT IS ORDERED** that the *Motion for Summary Judgment Pursuant to FRCP 56* (Doc. 100) filed by defendant the Town of Maringouin; the *Motion for Summary Judgment* (Doc. 102) filed by defendants Chief Hosea Anderson and Terrance Davis; and *RJ's Defendants' Motion for Summary Judgment* (Doc. 103) filed by RJ's Transportation, LLC and Patrick Ventress are **GRANTED IN PART** and **DENIED WITHOUT PREJUDICE IN PART**. The motions are

**GRANTED** in that all federal claims against these defendants are **DISMISSED WITH PREJUDICE.** The motions are **DENIED WITHOUT PREJUDICE** with respect to the state law claims.

**IT IS FURTHER ORDERED** that Plaintiff's facial challenge to La. Rev. Stat. Ann. § 14:47, 48, and 49 is **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Plaintiff is given fourteen (14) days to file a supplemental brief (not to exceed ten (10) pages) addressing why the federal claims against Bourgeois and James should not be dismissed on the same grounds set forth in this opinion. Any Defendant will have seven (7) days thereafter to respond. If Plaintiff fails to make a sufficient showing, it is highly likely the Court will decline to exercise supplemental jurisdiction over all remaining state law claims.

**IT IS FURTHER ORDERED** that Plaintiff's *Motion for Partial Summary Judgment* (Doc. 87), which seeks partial summary judgment on Plaintiff's state law malicious prosecution claim against Bourgeois and James, is **DENIED WITHOUT PREJUDICE** pending an outcome on the above jurisdictional issue.

Signed in Baton Rouge, Louisiana, on June 21, 2021.


_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**